144 F.3d 1182
 76 Fair Empl.Prac.Cas. (BNA) 1450,
73 Empl. Prac. Dec. P 45,397,
Fed. Sec. L. Rep. P 90,202,
98 Daily Journal D.A.R. 4837
Tonyja DUFFIELD, Plaintiff-Appellant,
v.
ROBERTSON STEPHENS & COMPANY, a partnership; Robertson
Stephens & Company, a corporation, Defendants-Appellees.
 No. 97-15698.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 9, 1998.
Decided May 8, 1998.
 
 Michael Rubin (argued), Jeffrey B. Demain, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, California; Cliff Palefsky, McGuinn, Hillsman & Palefsky, San Francisco, California, for plaintiff-appellant.
 Daniel H. Bookin, F. Curt Kirschner, Jr. (argued), David B. Newdorf, O'Melveny & Myers, San Francisco, California, for defendants-appellees.
 C. Gregory Stewart, J. Ray Terry, Jr., Gwendolyn Young Reams, Vincent J. Blackwood, Robert J. Gregory (argued and on the brief), for amicus curiae Equal Employment Opportunity Commission, Washington, DC, in support of plaintiff-appellant.
 David E. Feller, Berkeley, California, David T. Weckstein, San Diego, California, for amicus curiae The National Academy of Arbitrators, in support of plaintiff-appellant.
 John M. True, III, Rudy, Exelrod, Zeiff & True, San Francisco, California, for amicus curiae National Employment Lawyers Association, in support of plaintiff-appellant.
 Elaine R. Jones, NAACP Legal and Educational defense Fund, New York City; Judith L. Lichtman, Women's Legal Defense Fund, Washington, DC; Thomas J. Henderson, Lawyers' Committee for Civil Rights Under the Law, Washington, DC; Eva Jefferson Paterson, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, San Francisco, California, for amicus curiae in support of plaintiff-appellant.
 Paul D. Carrington, Duke University School of Law, Jean R. Sternlight, Florida State University College of Law, Richard C. Reuben, Stanford Center on Conflict and Negotiation, Katherine Van Wezel Stone, Cornell Law School, for amicus curiae Concerned Legal Scholars, in support of plaintiff-appellant.
 William J. Emanuel, Michael L. Wolfram, John S. Battenfeld, Morgan, Lewis & Brockius, Los Angeles, CA, for amicus curiae The Employers Group, in support of defendants-appellees.
 Samuel Estreicher, New York University School of Law, for amicus curiae California Employment Law Council, in support of defendants-appellees.
 Robert E. Williams, Ann Elizabeth Reesman, Erin Quinn Gery, McGuiness & Williams, Washington, DC, for amicus curiae Equal Employment Advisory Counsel, in support of defendants-appellees.
 Gary R. Siniscalco, Lisa K. McClelland, Orrick, Herrington & Sutcliffe, San Francisco, California, for amicus curiae Securities Industry Association, in support of defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; Eugene F. Lynch, District Judge, Presiding. D.C. No. C-95-0199-EFL.
 Before: CANBY and REINHARDT, Circuit Judges, and RESTANI, Court of International Trade Judge.*
 REINHARDT, Circuit Judge:
 
 
 1
 This case presents the issue whether employers may require as a mandatory condition of employment in a certain profession--here, broker-dealer in the securities industry--that all employees waive their right to bring Title VII and other statutory and non-statutory claims in court and instead agree in advance to submit all employment-related disputes to binding arbitration. We hold that, under the Civil Rights Act of 1991, employers may not by such means compel individuals to waive their Title VII right to a judicial forum. At the same time, we hold that because no state action is involved there is no constitutional bar to employers requiring employees to agree in advance to arbitrate state-law tort and contract claims (other than for violation of a state civil rights law).
 
 
 2
 * Like every individual who wishes to work in the United States as a broker-dealer in the securities industry, Tonyja Duffield was required, as a condition of employment mandated by the national securities exchanges, to waive her right to a judicial forum to resolve all "employment related" disputes and to agree instead to arbitrate any such disputes under the exchanges' rules. Prospective employees must satisfy this condition by signing the industry's Uniform Application for Securities Industry Registration or Transfer, commonly known as Form U-4, which registers them with all of the securities exchanges with which their employers are members. Paragraph 5 of Form U-4, the arbitration clause, reads as follows:
 
 
 3
 I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register, as indicated in item 10 as may be amended from time to time.
 
 
 4
 Because Robertson Stephens & Co. is a member of the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"), Duffield's "item 10" listed both of those organizations, and the form obligated her to abide by their rules, constitutions, and by-laws.
 
 
 5
 Both the NYSE and the NASD have rules that compel employees to arbitrate any employment-related dispute at the request of their employers. NYSE Rule 347 provides:
 
 
 6
 Any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization shall be settled by arbitration, at the instance of any such party, in accordance with the arbitration procedure prescribed elsewhere in these rules.
 
 
 7
 The NASD Code of Arbitration Procedure, as amended in 1993, provides:
 
 
 8
 [A]ny dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of associated person(s) with any members ... shall be arbitrated.
 
 
 9
 Id. at Part 1, § 1.[1] After signing her Form U-4 in 1988, Duffield began working as a broker-dealer for Robertson Stephens.
 
 
 10
 In January, 1995, Duffield brought suit in federal court, alleging sexual discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and California's Fair Employment and Housing Act (FEHA), breach of contract, deceit, intentional infliction of emotional distress, and negligent infliction of emotional distress. As a threshold matter, she requested a declaratory judgment stating that securities industry employees cannot be compelled to arbitrate their employment disputes under the arbitration provision in Form U-4. She made five specific arguments in this regard: (1) that the "compulsory" arbitration requirement mandated by Form U-4 does not constitute a voluntary agreement to arbitrate within the meaning of Title VII; (2) that signing Form U-4 does not constitute a "knowing" agreement to arbitrate within the meaning of Title VII; (3) that the NYSE's arbitration system fails adequately to protect employees' substantive Title VII rights; (4) that Form U-4 is an unconscionable contract of adhesion because it forces her to arbitrate her Title VII claims under an inadequate arbitration system; and (5) that the industry's mandatory arbitration requirement constitutes an unconstitutional condition of employment. Only in connection with her final argument did Duffield contest the arbitrability of her state law and contract claims.
 
 
 11
 After allowing extensive discovery on the securities industry's arbitration system, the district court rejected each of Duffield's arguments. It first denied her motion for summary judgment on her declaratory relief claim, and later granted Robertson Stephens' motion to compel arbitration of all of her substantive claims. The court declined to enter final judgment pursuant to Fed.R.Civ.P. 54(b) on Duffield's declaratory judgment claim, but certified both of its orders for immediate appeal pursuant to 28 U.S.C. § 1292(b).
 
 
 12
 On appeal, Duffield renews all five of her arguments below. We review de novo both the district court's denial of Duffield's motion for summary judgment, Curnow v. Ridgecrest Police, 952 F.2d 321, 323 (9th Cir.1991), and its order compelling arbitration. Zolezzi v. Dean Witter Reynolds, Inc., 789 F.2d 1447, 1449 (9th Cir.1986). In Part II, we address Duffield's contentions that are unique to her Title VII claims, and in Part III we consider her constitutional challenge to Form U-4.
 
 II
 
 13
 The security industry's Form U-4 requires employees to submit to a system that is most fittingly described as "compulsory arbitration." Throughout this opinion when we use the term "compulsory arbitration," we generally refer to the system under which employers compel their prospective employees as a condition of employment to waive their rights to litigate future employment-related disputes in a judicial forum (although the term applies as well to employees subjected to such a requirement for the first time during the course of their employment); under Form U-4, as in many other form or standard agreements, future employment-related disputes include, among others, all claims of discrimination that may arise under civil rights or other statutes. By compulsory arbitration, we do not, however, include systems under which employees agree, or otherwise elect, after disputes have arisen to submit them to arbitration. Nor do we include, for purposes of this opinion, agreements in which at the time of hiring employers give prospective employees the choice to opt in advance for arbitration of all future employment-related disputes or for retention of their statutory right to litigate such disputes. In short, we refer to an arbitration agreement as "compulsory" when individuals must sign an agreement waiving their rights to litigate future claims in a judicial forum in order to obtain employment with, or continue to work for, the employer. The question of the enforceability of such agreements ordinarily arises when, during the course of employment, an event then occurs that causes an employee to claim that his rights have been violated, and the employer, relying on the provisions of the waiver, seeks to compel the unwilling employee to arbitrate the claim.[2]
 
 
 14
 In this case, Duffield argues that she may not be compelled to arbitrate her statutory claims of sexual discrimination and sexual harassment under the waiver mandated by Form U-4.[3] We consider her argument in two steps. First, we describe the historical and statutory evolution of the arbitrability of employment discrimination claims. Second, in light of that background, we evaluate Duffield's specific argument that the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, precludes compulsory arbitration of Title VII claims.
 
 
 15
 * The Supreme Court has long recognized that in enacting Title VII Congress envisioned that decisions and remedies from the federal courts would play a unique and indispensable role in advancing the social policy of deterring workplace discrimination on the basis of race, sex, and national origin. See McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 358, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995) ("[t]he private litigant who seeks redress for his or her injuries vindicates both the deterrence and compensation objectives of the [anti-discrimination statutes]"); Kremer v. Chemical Const. Corp., 456 U.S. 461, 468, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (stating that "the federal courts were entrusted with the ultimate enforcement responsibility" under Title VII); Barrentine v. Arkansas-Best Freight Sys., 450 U.S. 728, 750, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (Burger, C.J., dissenting) (stating that federal courts should not defer to arbitration of Title VII claims "reached by the same combination of forces that had long perpetuated invidious discrimination"); Albermarle Paper Co. v. Moody, 422 U.S. 405, 417-18, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (stating that federal court relief under Title VII not only compensates victims but vindicates broader public interest in deterring future discrimination); Alexander v. Gardner-Denver Co., 415 U.S. 36, 44-45, 49-50, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (describing congressional intent to assign "federal courts [the] plenary powers to secure compliance with Title VII"). Most notably, in 1974, the Court unanimously held in Alexander v. Gardner-Denver that an arbitration clause contained in a collective bargaining agreement could not bar a plaintiff from seeking Title VII remedies in federal court. "The purpose and procedures of Title VII," the Court explained, "indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII; deferral [under any standard of review] to arbitral decisions would be inconsistent with that goal." Id. at 56, 94 S.Ct. 1011. The Court unanimously reaffirmed this reasoning two years later in Chandler v. Roudebush, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), extending Gardner-Denver to cover federal employees, and again in 1984 in McDonald v. City of West Branch, 466 U.S. 284, 290, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), stating without qualification that Gardner-Denver established that arbitration "cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory" rights embodied in Title VII.
 
 
 16
 Prior to 1991, therefore, "[Gardner-Denver ] was widely interpreted as prohibiting any form of compulsory arbitration of Title VII claims." Prudential Ins. Co. v. Lai, 42 F.3d 1299, 1303 (9th Cir.1994) (collecting cases). Even as arbitration became increasingly popular in the 1980's, every circuit court to address the issue held firm in refusing to enforce any agreement--in the collective bargaining context or otherwise--that required employees to resolve discrimination claims through binding arbitration. See, e.g., Alford v. Dean Witter Reynolds, Inc., 905 F.2d 104, 105-08 (5th Cir.1990); Utley v. Goldman Sachs & Co., 883 F.2d 184, 185-87 (1st Cir.1989); Swenson v. Management Recruiters Int'l, Inc., 858 F.2d 1304, 1305-07 (8th Cir.1988); Rosenfeld v. Department of Army, 769 F.2d 237, 239 (4th Cir.1985); EEOC v. Children's Hosp. Medical Ctr., 719 F.2d 1426, 1431 (9th Cir.1983) (en banc) (Fletcher, J., concurring). The circuit courts read Gardner-Denver as sending a simple message: Title VII is different. Thus, while the Supreme Court espoused in other contexts a "liberal federal policy favoring arbitration," Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Eighth Circuit held, in an opinion typical of those issued by the federal courts:
 
 
 17
 Although [Gardner-Denver ] involves a collective bargaining agreement, and not commercial arbitration under the FAA [Federal Arbitration Act, 9 U.S.C. §§ 1-14], this fact should not change the Court's analysis. The [Gardner-Denver ] Court was well aware that federal policy favors arbitration. That decision turned not on the fact that a collective bargaining agreement was involved, but instead on the unique nature of Title VII claims.
 
 
 18
 ....
 
 
 19
 We conclude that in the passage of Title VII it was the congressional intent that arbitration is unable to pay sufficient attention to the transcendent public interest in the enforcement of Title VII.
 
 
 20
 Swenson, 858 F.2d at 1306-07; see also Utley, 883 F.2d at 187 (holding that in enacting Title VII Congress had "clearly" intended to preclude binding arbitration); Rosenfeld, 769 F.2d at 239 (stating that the "plain lesson" of Gardner-Denver is that Congress entrusted the final resolution of Title VII claims to the federal courts). As we succinctly put it a few years ago, Gardner-Denver simply "precluded Title VII cases from being subjected to compulsory arbitration." Nghiem v. NEC Electronic, Inc., 25 F.3d 1437, 1441 (9th Cir.1994).
 
 
 21
 In 1991, however, the Supreme Court held in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), that employees could be required under Form U-4 and NYSE Rule 347 to arbitrate age discrimination claims brought under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq. Without discussing the similarities or differences between the ADEA and Title VII, the Court distinguished Gardner-Denver on the ground that it involved a collective bargaining agreement rather than an individual agreement to arbitrate. See 500 U.S. at 34-35, 111 S.Ct. 1647. The Court reasoned that "[a]lthough all statutory claims may not be appropriate for arbitration," individual agreements to arbitrate such claims should be placed on the same footing as other individual arbitration agreements "unless Congress itself has evinced an intention [discoverable in a statute's text, legislative history, or through an inherent conflict between arbitration and the purpose of the statute] to preclude a waiver of judicial remedies for the statutory rights at issue." Id. at 24-26, 111 S.Ct. 1647. Finding no such congressional intention evidenced by any inherent conflict between the ADEA's underlying purposes and arbitration, the Court upheld the enforceability of Form U-4 in that circumstance.[4]
 
 
 22
 The Court's decision in Gilmer made it plain that its previous decisions finding arbitration generally inconsistent with the purposes of Title VII are now insufficient to "show[ ] that Congress in enacting Title VII intended to preclude arbitration of claims under the Act." Mago v. Shearson Lehman Hutton Inc., 956 F.2d 932, 934 (9th Cir.1992). In the post-Gilmer era, if courts are to hold that an act precludes arbitration of claims to which it gives rise, a more concrete showing is required, including a scrupulous examination of Congress' actions and intent. Further, in examining congressional legislation, it is now incumbent upon courts to consider whether Congress intended to preclude every form of arbitration of claims arising under a particular statute, or whether it intended to preclude only certain forms of arbitration agreements.
 
 
 23
 Almost simultaneously with the Court's issuance of Gilmer, Congress enacted the Civil Rights Act of 1991, and, fortuitously, for the first time spoke directly to the arbitration of Title VII claims. While the Act was primarily designed to "overrule" hostile Supreme Court decisions in order to make discrimination claims easier both to bring and to prove in federal courts, and while it increased substantially the procedural rights and remedies available to Title VII plaintiffs in federal courts, it also stated that the parties could, "[w]here appropriate and to the extent authorized by law," opt to pursue alternative dispute resolution, including arbitration, to resolve their Title VII disputes. Pub.L. 102-166, § 118, reprinted in notes to 42 U.S.C. § 1981 (emphasis added).
 
 
 24
 In the wake of the 1991 Act, we have ruled that claimants who do not "knowingly" agree to arbitrate Title VII claims cannot be required to submit to arbitration. See Prudential Ins. Co. v. Lai, 42 F.3d 1299 (9th Cir.1994), cert. denied, 516 U.S. 812, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995). On the other hand, we also held in Nghiem that plaintiffs who "voluntarily initiate[ ] binding arbitration" of their Title VII claims are "bound by the arbitrator's decision." 25 F.3d at 1439-40. "Once a claimant submits to the authority of the arbitrator and pursues arbitration," we explained, "he cannot suddenly change his mind and assert lack of authority." Id. at 1440. We therefore rejected the argument that simply because the 1991 Act's amendments to Title VII provide for the right to jury trial, that right evinces a congressional intent to allow claimants to escape the binding effect of arbitrations that they initiated. See 25 F.3d at 1441. However, neither in Nghiem nor in any other prior case have we ever been required to consider the effect of the 1991 Act on the much more difficult question before us today: the enforceability of compulsory arbitration provisions that, as a condition of employment, compel persons to forego their statutory right to judicial relief with respect to future claims of Title VII discrimination, and to submit all such future claims to binding arbitration.
 
 B
 
 25
 Duffield argues that Congress' intent to preclude the compulsory arbitration of Title VII claims is conclusively demonstrated in the text and/or legislative history of the Civil Rights Act of 1991, as well as by an examination of its purposes. That express congressional intent, Duffield contends, clearly serves to distinguish post-1991 Title VII claims from the pre-1990 ADEA claim that the Supreme Court found arbitrable in Gilmer.[5] The EEOC, in a Notice dated July 10, 1997 and in an amicus brief filed in this case, has adopted this same position.[6] We agree with Duffield and the EEOC and hold that under the Civil Rights Act of 1991 employees may not be required, as a condition of employment, to waive their right to bring future Title VII claims in court.[7]
 
 
 26
 As Gilmer pointed out, the standard governing the enforceability of arbitration agreements under the FAA is well established. "Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The burden, therefore, is on Duffield to demonstrate that "Congress intended to preclude a waiver of a judicial forum for [Title VII] claims" in the manner mandated by Form U-4. Gilmer, 500 U.S. at 26, 111 S.Ct. 1647. "If such an intention exists, it will be discoverable in the text of [the act at issue], its legislative history, or an 'inherent conflict' between arbitration and the [act's] underlying purposes." Id. at 26, 111 S.Ct. 1647 (emphasis added); accord Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346; see also Block v. Community Nutrition Inst., 467 U.S. 340, 344, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) ("[A]ll presumptions used in interpreting statutes[ ] may be overcome by specific language or specific legislative history that is a reliable indicator of legislative intent.").
 
 
 27
 Congress declared as the 1990's dawned that "[n]ow--when more women and minorities are needed in the labor market to maintain the health and vitality of our economyis the time to restore the strength of federal equal employment protection." H.R.Rep. No. 40(I), 102d Cong., 1st Sess. 15-16 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 553-54. It therefore drafted the legislation that became the Civil Rights Act of 1991. The Act had two primary goals: (1) to "restore ... civil rights laws" by "overruling" a series of 1989 Supreme Court decisions that Congress thought represented an unduly narrow and restrictive reading of Title VII, see id. at 30; Landgraf v. USI Film Prods., 511 U.S. 244, 250-51, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (listing those decisions), and (2) to "strengthen" Title VII by making it easier to bring and to prove lawsuits, and by increasing the available judicial remedies so that plaintiffs could be fully compensated for injuries resulting from discrimination. Among other things, the 1991 Act provided for the first time a right to damages and to trial by jury and expanded Title VII's fee-shifting provisions. See H.R.Rep. No. 40(I) at 30; H.R.Rep. No. 40(II) at 1-4, 102d Cong., 1st Sess. 78 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 694-96.
 
 
 28
 In the context of the Act's significant enlargement of the substantive and procedural rights of victims of employment discrimination, Congress also included what Chief Judge Posner has termed "a polite bow to the popularity of 'alternate dispute resolution.' " Pryner v. Tractor Supply Co., 109 F.3d 354, 363 (7th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997). Section 118 of the 1991 Act provides that: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolutions including, ... arbitration is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this Title." Pub.L. 102-166, § 118, reprinted in notes to 42 U.S.C. § 1981 (emphasis added). Notwithstanding the inclusion of this innocuous-appearing section in a statute providing for a vast strengthening of employees' rights, Robertson Stephens argues that the plain language of the section evinces a congressional intent to allow--indeed, to "encourage"--the use of a process whereby employers condition employment on their prospective employees' agreeing to waive their rights to bring Title VII claims in federal (and state) court. By the time Congress passed the 1991 Act (but after it was drafted and reported out by the House Education and Labor Committee[8]), the argument goes, compulsory arbitration of all employment discrimination claims, including Title VII claims, was "authorized by law"--that is, by Gilmer--because the ADEA is similar to Title VII. Therefore, Robertson Stephens contends, compulsory arbitration must be included among the procedures that Congress intended to "encourage" in the 1991 Act.
 
 
 29
 We are the first circuit court to consider the "plain text" argument that Robertson Stephens makes in the context of an individual agreement that requires as a condition of employment the arbitration of Title VII claims.[9] District courts have split on the question. Compare Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 995 F.Supp. 190 (D.Mass.1998) (holding that 1991 Act precludes compulsory arbitration of Title VII claims under Form U-4) with Johnson v. Hubbard Broad., Inc., 940 F.Supp. 1447, 1457-58 (D.Minn.1996) (reaching opposite conclusion despite noting indications to the contrary in the Act's legislative history) and EEOC v. Frank's Nursery & Crafts, Inc., 966 F.Supp. 500, 504 (E.D.Mich.1997) (holding that compulsory arbitration of Title VII claims, "notwithstanding the legislative history of [the 1991 Act], do[es] not violate federal law or policy"). Two circuits have accepted a version of Robertson Stephens' argument in cases involving significantly different circumstances. Both cases arose under the Americans with Disabilities Act (ADA), which has an arbitration section similar to the 1991 Act's.[10] The first case did not involve either an employment agreement or a compulsory waiver, see Bercovitch v. Baldwin School, Inc., 133 F.3d 141, 148-50 (1st Cir.1998) (concluding that plain language of the ADA allows enforcement of voluntary, prospective agreement to arbitrate ADA claim against school), and the second, while it involved an employment contract, appears to have involved a voluntary agreement, see Miller v. Public Storage Mgmt., Inc., 121 F.3d 215 (5th Cir.1997) (enforcing arbitration clause to which the employee agreed at a performance review, while holding that the plain text of the ADA refutes the contention that "Congress did not intend for arbitration clauses to prevent individuals from bringing suit for ADA violations"). Those cases are readily distinguishable on their facts. There is a third and more troubling case, however--a case that involves a collective bargaining agreement and that conflicts directly with Gardner-Denver. See Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 880-82 (4th Cir.) (holding that employees can be compelled to submit ADA and Title VII claims to binding arbitration pursuant to collective bargaining agreement), cert. denied, --- U.S. ----, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996). In that case, a divided panel of the Fourth Circuit in fact flatly rejected Gardner-Denver, which in our view circuit courts are not free to do. See Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) (reaffirming that circuit courts must always follow directly binding Supreme Court decisions). The Fourth Circuit also ignored the reasoning of eight Justices on the subject of statutory analysis, relied on a separate opinion by Justice Scalia, and partially on the basis of that reasoning decided to disregard the legislative history of the 1991 Civil Rights Act. See id. at 882 (quoting Thompson v. Thompson, 484 U.S. 174, 188, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring)).[11] We respectfully conclude that the Fourth Circuit simply misconstrued the controlling law.[12]
 
 
 30
 At the outset, we note that Robertson Stephens' construction of § 118 is at odds with Congress' directive to read Title VII broadly so as to best effectuate its remedial purposes. In passing the 1991 Act, Congress explicitly directed courts "that when the statutory terms in [Title VII] are susceptible to alternative interpretations, the courts are to select the construction which most effectively advances the underlying congressional purpose" of the Act. H.R.Rep. No. 40(I) at 88; accord Dennis v. Higgins, 498 U.S. 439, 443, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (civil rights statutes should be construed broadly). The purpose of the Act was uniformly to expand employees' rights and "to increase the possible remedies available to civil rights plaintiffs." Lai, 42 F.3d at 1304 (emphasis added). It thus would be "at least a mild paradox," Pryner, 109 F.3d at 363, to conclude that in the very Act of which the "primary purpose" was "to strengthen existing protections and remedies available [to employees under Title VII]," H.R.Rep. No. 40(II) at 1, Congress "encouraged" the use of a process whereby employers condition employment on their prospective employees' surrendering their rights to a judicial forum for the resolution of all future claims of race or sex discrimination and force those employees to submit all such claims to compulsory arbitration.[13] It seems far more plausible that Congress meant to encourage voluntary agreements to arbitrate--agreements such as those that employers and employees enter into after a dispute has arisen because both parties consider arbitration to be a more satisfactory or expeditious method of resolving the disagreement.
 
 
 31
 Upon a careful reading of § 118 in context, moreover, it is difficult to escape the conclusion that the text of the section is, at a minimum, ambiguous--and that, at a maximum, it stands for a proposition that differs significantly from the one advanced by Robertson Stephens. When "examin[ing] the language of the governing statute," we must not be guided by "a single sentence or member of a sentence, but look[ ] to the provisions of the whole law, and to its object and policy." John Hancock Mut. Life Ins. Co. v. Harris Trust & Savings Bank, 510 U.S. 86, 94-95, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) (quoting Kelly v. Robinson, 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (in turn quoting Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 222, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (other quotation marks and citations omitted))); see also Bailey v. United States, 516 U.S. 137, 145, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995) ("We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme."). That arbitration is "encouraged" obviously means only that parties are encouraged to arbitrate within the statutory boundaries Congress contemplated. Indeed, it would seem entirely disingenuous to fasten onto that one word and conclude that Congress was boundlessly in favor of all forms of arbitration, regardless of the desires or interests of the persons whose rights the Civil Rights Act of 1991 was designed to protect.
 
 
 32
 The phrase "[w]here appropriate and to the extent authorized by law" is the critical statutory language; it provides the section's substantive limitations. While the phrase, if read out of context, is opaque, in the context of the statute and its "object and policy," John Hancock, 510 U.S. at 94-95, 114 S.Ct. 517, it tells us much about what Congress actually intended. For starters, following the Supreme Court, we are "reluctan[t] to treat statutory terms as surplusage." Babbitt v. Sweet Home Chapter, 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995); see also Mackey v. Lanier Collection Agency & Serv., 486 U.S. 825, 837 & n. 11, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (citing cases holding same). We therefore presume that Congress' qualifiers of "where appropriate" and "to the extent authorized by law," § 118, set forth separate and distinct limitations on the conditions and circumstances under which the arbitration process may be invoked to resolve Title VII claims. See Bailey, 116 S.Ct. at 507 ("assum[ing] that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning"). The presence of the limiting phrase "where appropriate" at the very least refutes the argument that "to the extent authorized by law" means that Congress intended either to encourage all forms of arbitration or to encourage the use of arbitration under all conditions and circumstances that might otherwise be lawful. Rather, it seems clear that Congress intended to encourage arbitration only under circumstances or conditions it deemed to be both legally permissible and appropriate.
 
 
 33
 While the words "where appropriate," standing by themselves, give us little clue as to the circumstances under which Congress deemed arbitration to be "appropriate," or, as the dictionary defines the term, "proper, fitting" or "specially suitable," 1 The New Shorter Oxford English Dictionary 103, def'n 1 (4th ed.1993), we can glean at least a reasonable understanding of Congress' intent from examining the purpose and objective of the 1991 Act, that purpose and objective being to expand employees' rights and remedies under Title VII. "Where appropriate," as used in the Act, would appear to mean where arbitration furthers the purpose and objective of the Act--by affording victims of discrimination an opportunity to present their claims in an alternative forum, a forum that they find desirable--not by forcing an unwanted forum upon them. See, e.g., John Hancock, 510 U.S. 86, 94-95, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) (courts should construe statutes guided by the "object and policy" of the whole law); United States v. Qualls, 140 F.3d 824 (9th Cir.1998) (en banc) (same).
 
 
 34
 Likewise, § 118's other qualifier, the phrase "to the extent authorized by law," does not automatically lend itself to a fixed definition. It most likely codifies the "law" as Congress understood it at the time it either drafted or passed the provision. As the Supreme Court has stated, we should "examine initially" the statute "with an eye toward determining Congress' perception of the law that it was shaping or reshaping." Thompson v. Thompson, 484 U.S. 174, 180, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (emphasis added); see also Brown v. GSA, 425 U.S. 820, 828, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (applying this principle to congressional amendments to Title VII). The overwhelming weight of the law at the time Congress drafted § 118, and it was reported out of the House Education and Labor Committee, was to the effect that compulsory agreements to arbitrate Title VII claims were unenforceable. In other words, such agreements were not "authorized by law." To the contrary, the law at that time prohibited employers from compelling employees to arbitrate Title VII claims pursuant to collective bargaining agreements, "in large part" because of the Court's recognition of the critical role that Congress envisioned for the independent federal judiciary in advancing Title VII's societal goal. See McDonald, 466 U.S. at 289, 104 S.Ct. 1799; Gardner-Denver, 415 U.S. at 56, 94 S.Ct. 1011. Although the Supreme Court had adopted in contexts outside of employment discrimination a "liberal federal policy favoring arbitration agreements," Moses H. Cone, 460 U.S. at 24, 103 S.Ct. 927, it had done even that only under the explicit assumption that these agreements constituted "freely negotiated choice-of-forum clauses." Mitsubishi, 473 U.S. at 628, 631, 105 S.Ct. 3346; see also, id. (stating that "nothing ... prevents a party from excluding statutory claims from the scope of an agreement to arbitrate"); Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 483-84, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (upholding agreement to arbitrate because it "broadened" plaintiff's right to select a forum for resolving disputes); Volt Info. Sciences, Inc. v. Board of Trustees, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ("Arbitration under the [FAA] is a matter of consent, not coercion."). Perhaps most important, as of the time § 118 was drafted and reported out of the House Education and Labor Committee, the circuit courts, without exception, had "widely interpreted" Title VII as prohibiting "any form of compulsory arbitration," including in individual employment cases. Lai, 42 F.3d at 1303 (emphasis added); see also supra at 1189-91 (gathering cases). Certainly when Congress wrote the 1991 Act, it could not have been expected to be better able than the circuit courts to predict the Supreme Court's narrowing of Gardner-Denver. Cf. Thompson, 484 U.S. at 180, 108 S.Ct. 513 (assuming Congress' view of the law to be the lower courts' consensus where the Supreme Court had not spoken to the contrary).
 
 
 35
 By the time the 1991 Act was actually passed, the law had become less clear. The Court's decision in Gilmer was issued just before the 1991 Act was officially enacted, leaving room for the possible inference that § 118 intended to codify that decision also. Yet even if such an inference might have been permissible under other circumstances, at the time the 1991 Act was enacted it was still at least an open question whether Gilmer applied to Title VII claims. The Gilmer opinion itself is silent regarding any comparison between Title VII and the ADEA. The ADEA shares many of the substantive provisions of Title VII, but its remedial and procedural provisions were originally modeled after the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq., not Title VII. Lorillard v. Pons, 434 U.S. 575, 578-84, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978); see also McKennon, 513 U.S. 352, 357, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) (noting that even after the ADEA's enforcement was transferred to the EEOC its procedural provisions follow the FLSA and are distinct from those of Title VII). In fact, the Court had held that because of the "crucial" differences between the procedural provisions in the ADEA and Title VII, any attempt to divine congressional intent in this area by comparing the two statutes "is misplaced." Lorillard, 434 U.S. at 584-85, 98 S.Ct. 866. While, in the absence of further guidance from Congress itself, there could be room for doubt over its intent with respect to the effect of the phrase "to the extent authorized by law" on Title VII's procedural rules, when the phrase is read in light of the other qualifying phrase and in light of the objectives and purposes of the 1991 Act it seems far more likely that Congress was referring to the Gardner-Denver line of cases than to Gilmer.
 
 
 36
 Any doubt on this point, however, is resolved by even a cursory glance at § 118's legislative history. That history makes it clear that there is no need to hypothesize over whether Congress intended to include Gilmer within its definition of what was "authorized by law." It is evident from the legislative history that the answer to that inquiry is a resounding "no." Congress in no way intended to incorporate Gilmer 's holding into Title VII, or to authorize compulsory arbitration of Title VII claims. In fact, its clearly expressed intent was precisely the opposite.
 
 
 37
 The legislative history of § 118 unambiguously confirms that Congress sought to codify the law as it stood at the time the section was drafted, and eliminates any possibility that Congress intended to write Gilmer into Title VII law or to leave the question of which forms of arbitration were permissible to the whims and presumptions of future court decisions. Specifically, the committee reports and the floor statements describing § 118--which we have already held in Lai demonstrate Congress' intent in passing the 1991 Act, see 42 F.3d at 1304-05--plainly demonstrate that in allowing arbitration only "[w]here appropriate and to the extent authorized by law" Congress intended to adopt Gardner-Denver 's firm rule precluding enforcement of compulsory agreements to arbitrate future Title VII claims, not Gilmer 's possible validation of such agreements. In fact, given the possible ambiguity in the literal language of the statutory phrases that relate specifically to arbitration, it is the unusual force and clarity of the statute's legislative history that is ultimately dispositive in this case.
 
 
 38
 "In surveying legislative history, [the Supreme Court has] repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying the proposed legislation.' " Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (quoting Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)). This is especially true when, as in this case, the Committee reports were published before Congress' votes on the bill. The House Committee on Education and Labor, in its report on H.R. 1, the bill that became the Civil Rights Act of 1991, "explained that the purpose of [§ 118] was to increase the possible remedies available to civil rights plaintiffs." Lai, 42 F.3d at 1304. The Committee report states:
 
 
 39
 The Committee emphasizes ... that the use of alternative dispute mechanisms is ... intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the committee believes that any agreement to submit disputed issues to arbitration, whether in the context of collective bargaining or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Committee does not intend this section to be used to preclude rights and remedies that would otherwise be available.
 
 
 40
 H.R.Rep. No. 40(I) at 97 (emphasis added), quoted in Lai, 42 F.3d at 1304. The Committee's explanation of § 118 echoed exactly the Conference Report's description of the same (verbatim) section in the Civil Rights Act of 1990, which President Bush vetoed for other reasons. In that report, the Conference Committee explained that "any agreement to submit disputed issues to arbitration ..., in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII." H.R. Conf. Rep. No. 755, 101st Cong., 2d Sess. 26 (1990). These statements make it clear that even though Gardner-Denver 's literal holding applied only to collective bargaining agreements, Congress intended that the decision's rule against compulsory arbitration of Title VII claims be applicable to all "employment contract[s]." In other words, Congress concluded that all such mandatory agreements as conditions of employment were, at the very least, "inappropriate," and thus unenforceable.
 
 
 41
 Lest there be any doubt as to the intended meaning of the Act's arbitration provision, Congress in fact specifically rejected a proposal that would have allowed employers to enforce "compulsory arbitration" agreements. It did so in the most emphatic terms, explaining that:
 
 
 42
 H.R. 1 includes a provision encouraging the use of alternative means of dispute resolution to supplement, rather than supplant, the rights and remedies provided by Title VII. The Republican substitute, however, encourages the use of such mechanisms "in place of judicial resolution." Thus, under the latter proposal employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints. Such a rule would fly in the face of Supreme Court decisions holding that workers have the right to go to court, rather than being forced into compulsory arbitration, to resolve important statutory and constitutional rights, including equal opportunity rights. See, e.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). American workers should not be forced to choose between their jobs and their civil rights.
 
 
 43
 H.R.Rep. No. 40(I) at 104 (emphasis added). This rejection of the "Republican" proposal provides still further "strong evidence" of Congress' intent, Thompson, 484 U.S. at 185, 108 S.Ct. 513, to preclude compulsory arbitration of civil rights claims and to "encourage" only voluntary agreements--agreements that do not require potential employees to waive their right to litigate in a judicial forum as a mandatory condition of employment. This part of the Committee report also eliminates any possibility that § 118 was in any way a product of legislative compromise that was not meant to advance the overall purposes of the Act.
 
 
 44
 That Gilmer turned out to undermine some of Congress' preferred Supreme Court decisions, of course, in no way alters Congress' expressed intent, in drafting § 118, to codify its position that "compulsory arbitration" of Title VII claims was not "authorized by law," and that compelling employees to forego their rights to litigate future Title VII claims as a condition of employment was not "appropriate." Indeed, Congress' reading of Gardner-Denver and McDonald was--as the Court remarked regarding Congress' understanding of a different facet of Title VII law that it amended -
 
 
 45
 entirely reasonable. Whether [Congress'] understanding [of the law] was in some ultimate sense incorrect is not what is important in determining the legislative intent in amending the 1964 Civil Rights Act.... For the relevant inquiry is not whether Congress correctly perceived the state of the law, but rather what its perception of the law was.
 
 
 46
 Brown, 425 U.S. at 828, 96 S.Ct. 1961 (footnote omitted); see also Blanchard v. Bergeron, 489 U.S. 87, 91-93, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (holding that Congress codified the holdings of three cases when a Committee report cited those cases and said that they "correctly applied" its view of the law). And, as we have said many times before, so long as there is no constitutional infirmity, Congress' intended meaning of terms reigns supreme in the statutory arena. See, e.g., Arriaga-Barrientos v. INS, 937 F.2d 411, 414-15 (9th Cir.1991) (holding that even if courts are "sympathetic" to a policy argument contrary to a statute's requirements, "we lack the legitimate authority to undermine legitimate congressional will"). When Congress codifies the policy of certain of the courts' holdings, we are bound to follow the dictates of those cases regardless of whether we think they were correctly decided, and regardless of whether they are subsequently limited or overruled.
 
 
 47
 The Committee's view of § 118 was reiterated by key congressmen in the floor debates, who repeatedly stated that § 118 encouraged arbitration only "where parties knowingly and voluntarily elect to use those methods." 137 Cong. Rec. S15478 (daily ed. Oct. 30, 1991) (statement of Sen. Dole); see also 137 Cong. Rec. H9548 (daily ed. Nov. 7, 1991) (statement of Rep. Hyde) (explaining that § 118 encourages arbitration where "the parties knowingly and voluntarily elect" to submit to such procedures). The most informed and important statements were made by Representative Edwards, the Chairman of the House Committee on Education and Labor. Representative Edwards unequivocally explained during the debate immediately prior to the Act's passage that the provision was "intended to be consistent with ... Gardner-Denver." 137 Cong. Rec. H9530 (daily ed. Nov. 7, 1991) (statement of Rep. Edwards). The Chairman added, so as to make the point perfectly clear:
 
 
 48
 This section contemplates the use of voluntary arbitration to resolve specific disputes after they have arisen, not coercive attempts to force employees in advance to forego statutory rights. No approval whatsoever is intended of the Supreme Court's recent decision in Gilmer ... , or any application or extension of it to Title VII.
 
 
 49
 Id. (emphasis added).[14] Finally, President Bush echoed Congress' understanding of the arbitration section in signing the Act, stating that "section 118 encourages voluntary agreements between employers and employees to rely on alternative mechanisms such as mediation and arbitration." Statement of the President of the United States, Signing Ceremony, Pub.L. No. 102-166 (Nov. 21, 1991), reprinted in 1991 U.S.C.C.A.N. 768, 769 (emphasis added). No statements were made in reports, on the floor, or by the President that contradicted this basic understanding.[15]
 
 
 50
 Robertson Stephens' principal response to the force of the Act's legislative history is that we should disregard entirely the evidence of Congress' intent and hold instead that, even though Congress did not intend to adopt Gilmer, the language of § 118 must be read as doing so.[16] Under Robertson Stephens' reading of § 118, the phrase "to the extent authorized by law" would be simply an elastic phrase, not expressly adopting or rejecting any Supreme Court case, but expanding and contracting with the ebb and flow of court decisions. Thus, Robertson Stephens would have us conclude that although § 118 was intended by its drafters, and understood by both the Democratic and Republican members of both Committees that considered the bill, to preclude compulsory arbitration of Title VII claims--an intention unequivocally reiterated throughout the floor debates--the section, without a single word being changed, nevertheless was instantaneously transmogrified, and took on exactly the opposite meaning, on the day the Court's decision in Gilmer was announced. Any such "through the looking glass" construction would entail a gross perversion of the legislative process.
 
 
 51
 In essence, confronted with the legislative history, Robertson Stephens retreats to its "plain meaning" theory, urging us to construe the words "to the extent authorized by law" as encouraging the use of all lawful forms of arbitration at all times and under all circumstances. But "the meaning of statutory language, plain or not, depends on context." Brown v. Gardner, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (quoting King v. St. Vincent's Hosp., 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991)). And, as we explained previously, the phrase's actual meaning, when viewed in the context of the remainder of the Act, is at the least ambiguous, and at the most quite different from that which Robertson Stephens urges. Robertson Stephens' argument ignores not only the purposes and objectives of the 1991 Act, but also the fact that the statute contains an express limitation in addition to the phrase "to the extent authorized by law"--the limitation "where appropriate"--which must be read along with it. Thus, even if an elastic interpretation of "to the extent authorized by law" would otherwise be reasonable, Robertson Stephens' construction would deprive the phrase "where appropriate" of any content whatsoever. If we are to give those additional words of limitation meaning, as the Supreme Court tells us we must, see, e.g., Bailey, 116 S.Ct. at 507; Babbitt, 515 U.S. at 698, 115 S.Ct. 2407, they must be construed as incorporating Congress' purposes and objectives as expressed in the 1991 Act, see, e.g., John Hancock, 510 U.S. at 94-95, 114 S.Ct. 517 (collecting cases holding that courts must interpret terms of statute consistent with the act's "object and policy")--namely, as increasing the rights and remedies afforded to victims of discrimination.
 
 
 52
 In the end, what is perhaps the most compelling reason for rejecting Robertson Stephens' argument is the specific instruction in Gilmer and several preceding arbitration cases to look to the statute's terms and to "its legislative history," as well as its underlying purpose, in determining whether Congress "evinced an intention to preclude a waiver of judicial remedies" in the particular circumstances. Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (quoting Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346) (emphasis added); accord Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226-27, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Whatever role we should generally assign to legislative history, our duty when we try to discern whether Congress intended to preclude a waiver of a judicial forum with respect to claims arising under a particular statute is clear. Such an intent, the Court has expressly and repeatedly held, may be discerned in the text of the relevant act or in its legislative history, as well as in any inherent conflict between the statutory purposes and arbitration. Id. Not a single word in the 1991 Act's legislative history suggests that Congress intended to make the validity of requiring the arbitration of Title VII claims dependent on future court decisions. To the contrary, the legislative history of the Act makes it absolutely clear that Congress intended § 118 to codify the Gardner-Denver approach to compulsory arbitration agreements and to preclude the enforceability of such agreements with respect to Title VII claims. Congress "perce[ived] the state of the law," Brown, 425 U.S. at 828, 96 S.Ct. 1961, as forbidding such agreements and, at the very least, viewed them as wholly "[in]appropriate." It specifically rejected a proposal that would have allowed them to be enforced. It thought, mistakenly or not, that the use of compulsory arbitration provisions would, in the House Committee's resounding and unequivocal words, "force[ ] American workers to choose between their jobs and their civil rights." H.R.Rep. No. 40(I) at 104. To force such a choice was certainly not the purpose or intent of Congress in passing the Civil Rights Act of 1991.[17]
 
 
 53
 In view of the fact that "the context, language, and [legislative] history of" the 1991 Act "together make out a conclusive case," Thompson, 484 U.S. at 187, 108 S.Ct. 513, that Congress intended to preclude compulsory arbitration of Title VII claims, we think it inescapable that Form U-4 is unenforceable as applied to such claims. Form U-4 compels precisely what Congress intended to prohibit in the 1991 Act: mandatory requirements under which prospective employees agree as a condition of employment to surrender their rights to litigate future Title VII claims in a judicial forum and accept arbitration instead. Because every employer in the securities industry requires its employees to sign Form U-4, the form is especially violative of Congress' limitations. Form U-4 is a take-it-or-leave-it offer for anyone wishing to work anywhere in the United States as a broker-dealer in that industry. It forces individuals like Duffield to opt for one of two "choices": sign Form U-4 or seek another profession. This sort of dilemma is fundamentally at odds with a provision of the Civil Rights Act of 1991, § 118, that was intended to help deter employment discrimination by increasing claimants' choice of fora. Cf. Bercovitch, 133 F.3d at 150 (enforcing arbitration agreement between parents and school as applied to ADA claim because it was purely "voluntary," but suggesting that "involuntary" agreements, or agreements that individuals had no "influence over," would be unenforceable).
 
 
 54
 In holding that Form U-4 is unenforceable as applied to Title VII claims, we do not, of course, mean to suggest that Congress sought in the 1991 Act to preclude employees from agreeing after a claim has arisen to submit the dispute to arbitration.[18] Indeed, employees in many instances may believe that arbitration is preferable to protracted and expensive litigation and will willingly make that choice. Because of the legal community's recently increased faith in arbitration, those plaintiffs are now "encouraged" to resolve their employment disputes in that manner, and if they choose to do so, they are bound by the arbitrator's decision. See Nghiem, 25 F.3d at 1440. The contract before us, however, requires compulsory arbitration in every sense of the word, and it is contracts of that nature we are compelled to hold unenforceable under the Civil Rights Act of 1991.
 
 
 55
 We recognize that, as the Supreme Court has stated, agreements to arbitrate must generally be treated not as "forego[ing] the substantive rights afforded by [a] statute," but rather as merely changing the forum in which they are protected. Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (quoting Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346). Yet even assuming that the general federal policy in favor of arbitration would ordinarily apply to the compulsory arbitration of civil rights claims, we are not free to apply that policy here. Where Congress has manifested its intent, with regard to arbitration questions and otherwise, the Supreme Court has made it abundantly clear that the judiciary is not free to "legislate" its own contrary preferences. See, e.g., Brogan v. United States, --- U.S. ----, 118 S.Ct. 805, 811-12, 139 L.Ed.2d 830 (1998) (stating that "[c]ourts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so"); Negonsott v. Samuels, 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) ("[A court's] task is to give effect to the will of Congress [when] its will has been expressed in reasonably plain terms."); Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (directing courts to follow congressional intent in arbitration context); Rodriguez de Quijas, 490 U.S. at 483-84, 109 S.Ct. 1917 (same). Whether or not permitting compulsory arbitration of Title VII claims is "more desirable than" the ban that Congress has imposed on such practice, "the proper venue for resolving that issue remains on the floor of Congress." Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, --- U.S. ----, 118 S.Ct. 956, 964, 140 L.Ed.2d 62 (1998). For now, at least, Congress has resolved the question in favor of preserving the right of victims of employment discrimination to seek their remedy in the federal courts.
 
 III
 
 56
 Duffield also argues that she cannot be required to arbitrate her claims because the arbitration agreement imposes an unconstitutional condition of employment. This argument, unlike the one we have just considered, is applicable to her state tort and contract claims as well as to her claims that her civil rights have been violated. The argument is, in essence, that Form U-4 requires Duffield to forfeit her Fifth Amendment right to due process, her Seventh Amendment right to a jury trial, and her right to an Article III judicial forum in order to obtain employment as a broker-dealer in the securities industry. While this argument was not raised or addressed by the Court in Gilmer, it would, if meritorious, render Form U-4 unenforceable as applied to all of Duffield's underlying claims for relief. The district court found it unmeritorious, holding that the essential prerequisite of state action was lacking. We agree.
 
 
 57
 A threshold requirement of any constitutional claim is the presence of state action. This requirement, however, does not restrict the application of the Constitution solely to governmental entities. Private entities like the NYSE and the NASD may be held to constitutional standards if their actions are "fairly attributable" to the state. Lugar v. Edmondson Oil Co., 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The Supreme Court has established three criteria for satisfying this standard:
 
 
 58
 First, [t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State.... The complaining party must also show that there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action may fairly be treated as that of the State itself. The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains....
 
 
 59
 Second, ... a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State. Mere approval or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives....
 
 
 60
 Third, the required nexus may be present if the private party has exercised powers that are traditionally the exclusive prerogative of the State.
 
 
 61
 Blum v. Yaretsky, 457 U.S. 991, 1004-05, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (internal quotations and citations omitted). Duffield asserts that state action is independently present under each test. We do not agree.
 
 
 62
 * Duffield's first argument is that state action is present because "federal law requires all broker-dealers to register with a national securities exchange (i.e., the NYSE or NASD), and to abide by the rules of that exchange--including its mandatory arbitration rules--as a condition of their continued employment." Appellant's Brief at 43. Robertson Stephens counters this argument by pointing out that federal law did not require broker-dealers to register with a national securities exchange until 1993, five years after Duffield signed her Form U-4. Therefore, it asserts, no federal law "required" Duffield to sign the form in 1988. Robertson Stephens is correct.
 
 
 63
 The rules of NASD and the NYSE are not fairly attributable to the government unless they carry the force of federal law. And prior to 1993, no federal statute or regulation required Duffield to register with the securities exchanges, much less to sign Form U-4 or to arbitrate employment disputes. See Association of Inv. Brokers v. SEC, 676 F.2d 857, 861-62 (D.C.Cir.1982). Thus, when Duffield signed her Form U-4 in 1988 and thereby waived her rights to litigate employment-related disputes in a judicial forum, she did not do so because of any state action.[19]
 
 
 64
 In 1993, however, the Securities and Exchange Commission (SEC) adopted a regulation that required all broker-dealers to be registered with at least one of the securities organizations of which Duffield's firm was a member--i.e., the NASD and the NYSE--before effecting any securities transaction. See 17 C.F.R. § 240.15b7-1 (adopted May 11, 1993). That registration regulation, like the SEC's registration regulation at issue in Blount v. SEC, 61 F.3d 938 (D.C.Cir.1995), cert. denied, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996), "operates not as a private compact among brokers and dealers but as federal law." Id. at 941. Hence, to borrow Blount 's reasoning, as a government-mandated "condition to any participation in a ... securities career," the current requirement that new employees register with a national securities exchange "constitutes government action of the purest sort." Id.
 
 
 65
 Duffield attempts to take advantage of this new regulation by arguing that its registration requirement was a governmentally imposed condition of her continuing employment and that Robertson Stephens did not invoke the arbitration clause until 1995 when it moved to compel arbitration. State action can be present, however, only to the extent that there is "a sufficiently close nexus between the State and the challenged action," Jackson v. Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (emphasis added); the action that Duffield challenges in her constitutional claims is the requirement that she waive her right to litigate employment-related disputes. Since agreements to arbitrate are "valid, irrevocable, and enforceable," 9 U.S.C. § 2 (emphasis added), to the same extent as any other contract, see Gilmer, 500 U.S. at 24, 111 S.Ct. 1647, it is immaterial that years after Duffield signed her Form U-4 containing the arbitration provision, federal law required other employees like her to register with securities exchanges or even that it compelled her to remain registered. No federal law required Duffield to waive her right to litigate employment-related disputes by signing the Form U-4 in 1988, and no state action is present in simply enforcing that agreement. Insofar as Duffield argues that the "challenged action" is the requirement that she actually arbitrate her lawsuit, that requirement is found in her private contract, not in federal law.[20]
 
 B
 
 66
 Duffield next argues that because the NYSE and NASD are required to obtain SEC approval before their rules may go into effect, see 15 U.S.C. §§ 78f(a), (b), 78o-3(a), (b), and because the SEC has exercised influence over such rules, the government may fairly be said to be encouraging the mandatory arbitration requirement. We previously have recognized that
 
 
 67
 the [SEC] has virtually plenary authority over the arbitration procedures adopted by the national securities exchanges and securities associations. See Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 2341, 96 L.Ed.2d 185 (1987). This authority includes the power to "abrogate, add to, and delete from" the arbitration rules adopted by such bodies if necessary or appropriate to protect rights created by the Securities Acts. Id.; 15 U.S.C. § 78s(c) (1982).
 
 
 68
 Cohen v. Wedbush, Noble, Cooke, Inc., 841 F.2d 282, 286 (9th Cir.1988). We conclude here, however, that the SEC has not exercised sufficient influence over the compulsory arbitration requirement in Form U-4, the NASD procedures, or NYSE rules to deem that requirement the choice of the state.
 
 
 69
 The touchstone of state action in the context of governmental oversight is whether the government has moved beyond mere approval of private action into the realm of "encouragement, endorsement, and participation" of that action. Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 615-16, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); see also Blum, 457 U.S. at 1004, 102 S.Ct. 2777 (stating that state action is present when "the government has provided such significant encouragement, either overt or covert, that the [private party's] choice must be deemed that of the State"). The SEC has thus far failed to cross that line with regard to the NASD's and NYSE's compulsory arbitration requirements. "To begin with the obvious, there is nothing in the [Securities Exchange Act of 1934] and there is no Commission rule or regulation that specifies arbitration as the favored means of resolving employer-employee disputes." Merrill Lynch, Pierce, Fenner & Smith v. Ware, 414 U.S. 117, 135-36, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973). No SEC rule or action that has been called to our attention encourages the NASD or the NYSE to compel arbitration. This puts the role of the SEC in a critically different light than that of the Federal Railroad Administration in Skinner, which drafted regulations making plain its "strong preference for [drug] testing," explicitly conferred on railroads the authority to conduct such tests, required railroads and employees to perform such tests, and codified its right to receive certain biological samples. See 489 U.S. at 615, 109 S.Ct. 1402.
 
 
 70
 The SEC's role to date of approving the exchanges' rules and conducting oversight of their procedures has been no more aggressive than that of the Public Utilities Commission in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). In that case, a private utility was required by the state's regulatory scheme to obtain approval of its business practices from the utility commission. When those practices were challenged, the Court declined to find state action, reasoning that "where the commission has not put its weight on the side of the proposed practice by ordering it, ... [its] failure to overturn this practice" does not make its action "state action" for purposes of constitutional inquiries. Id. at 357, 95 S.Ct. 449. Duffield has pointed to numerous instances of the SEC's oversight and development of the exchanges' arbitration rules and procedures, but she has failed to put forth any example of governmental encouragement or endorsement of the compulsory arbitration requirement itself. Thus, the SEC's involvement is insufficient under Skinner, Blum, and Jackson to render the industry's overall requirement that its employees submit to arbitration in lieu of court proceedings fairly attributable to the state.
 
 C
 
 71
 Duffield's last argument is that the NASD and NYSE are invoking governmental authority because through their arbitration system they are "perform[ing] the government function of enforcing and adjudicating Title VII." Appellant's Brief at 53. This argument is contrary to the established law of this circuit. We have long held that, since dispute resolution is not an "exclusive" governmental function, neither private arbitration nor the judicial act of enforcing it under the FAA constitutes state action. See, e.g., FDIC v. Air Florida Sys., Inc., 822 F.2d 833, 842 n. 9 (9th Cir.1987). The 1991 Civil Rights Act's allowance of voluntary, private arbitration agreements forecloses the assertion that civil rights statutes should be exempted from this general rule.
 
 IV
 
 72
 Duffield has met her burden of showing that Congress intended in enacting the Civil Rights Act of 1991 to preclude the compulsory arbitration of Title VII disputes. Form U-4 is, therefore, unenforceable with respect to her Title VII and FEHA claims. Because no state action was involved in Duffield's mandatory waiver, however, there is no constitutional bar to enforcing Form U-4 with respect to her state tort and contract claims. Accordingly, the district court's order compelling arbitration is AFFIRMED IN PART and REVERSED IN PART. The district court's denial of Duffield's motion for summary judgment on her declaratory relief claim is AFFIRMED IN PART and REVERSED IN PART. The case is REMANDED for further proceedings consistent with this opinion.
 
 
 73
 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 
 
 
 *
 Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation
 
 
 [1]
 After Duffield filed her opening brief in this case, the NASD voted to eliminate its mandatory arbitration requirement with regard to civil rights claims. The organization's proposal, which cannot be formally implemented until the Securities and Exchange Commission approves it, would mandate three basic changes in the current rule: (1) it would "permit employees to choose between entering into private arbitration agreements with their employers, or reserving the right to file a case in federal or state court for statutory discrimination claims"; (2) it would guarantee heightened procedural protections in arbitration by requiring forums that satisfy the standards in the ABA's "Due Process Protocol"; and (3) it would provide "enhanced disclosure [of the arbitration rules] to employees." NASD Proposes Eliminating Mandatory Arbitration of Employment Discrimination Claims for Registered Brokers, NASD Press Release, August 7, 1997; see also Deborah Lohse, NASD Votes to End Arbitration Rule in Cases of Bias, Wall St. J., August 8, 1997, at B14 (reporting NASD policy change, but noting that "mandatory arbitration is apt to continue, industry experts say, because the NASD is not forbidding firms from including arbitration requirements in their employment contracts"). This probable change in NASD's rules in no way affects the dispute in this case, however. Furthermore, nothing in the record suggests that the NYSE is reconsidering its rule
 
 
 [2]
 We do not in this opinion consider the enforceability of an arbitration award in instances in which an employee has submitted the dispute to arbitration without challenging the enforceability of the arbitration agreement. See, e.g., Nghiem v. NEC Electronic, 25 F.3d 1437 (9th Cir.1994)
 
 
 [3]
 Duffield's sexual discrimination and sexual harassment claims under Title VII appear to be identical to those she brings under the FEHA. Because "[p]arallel state anti-discrimination laws are explicitly made part of Title VII's enforcement scheme," FEHA claims are arbitrable to the same extent as Title VII claims. Prudential Ins. Co. v. Lai, 42 F.3d 1299, 1303 n. 1 (9th Cir.1994) (citing Kremer v. Chemical Const. Corp., 456 U.S. 461, 477, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); Salgado v. Atlantic Richfield, 823 F.2d 1322, 1326 (9th Cir.1987))
 
 
 [4]
 Gilmer argued only that there was an inherent conflict between the ADEA and arbitration and did not contend that the text or legislative history of the ADEA evinced a congressional intent to preclude arbitration. See 500 U.S. at 26, 111 S.Ct. 1647
 
 
 [5]
 After the Supreme Court granted certiorari in Gilmer, Congress amended the ADEA to provide that all waivers of rights under the Act, apparently including the right to a jury trial, 29 U.S.C. § 626(c), must be "knowing and voluntary." See Older Workers Benefit Protection Act of 1990, Pub.L. 101-433, 104 Stat. 983 (1990); 29 U.S.C. § 626(f)(1); Oubre v. Entergy Operations, Inc., --- U.S. ----, ----, 118 S.Ct. 838, 841, 139 L.Ed.2d 849 (1998). A waiver is not considered knowing and voluntary if the individual waives "rights or claims that may arise after the date the waiver is executed." 29 U.S.C. § 626(f)(1)(C). The Supreme Court did not, however, consider this new statutory language in Gilmer. Thus, current ADEA claims may require different treatment
 
 
 [6]
 We have never stated what level of deference is due a "notice," as opposed to a guideline or a policy statement, by the EEOC. The Supreme Court has generally advised that "the level of deference afforded will depend on the thoroughness evident in [the EEOC's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if not control." EEOC v. Arabian American Oil Co., 499 U.S. 244, 257, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (internal quotations omitted). The import of the Court's statement seems to be that we should defer to "notices" insofar as they represent reasonable interpretations of Title VII. See EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 115, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988) (deferring to EEOC's position on issue that apparently was not formalized in any document outside of the litigation at issue because it represented a reasonable interpretation of Title VII). That is the procedure we have adopted regarding other agency's notices interpreting statutes under their jurisdiction, see Alexander v. Glickman, 139 F.3d 733 (9th Cir.1998), and that is the course we follow here
 
 
 [7]
 Because we hold that the 1991 Act precludes compulsory arbitration, we do not reach Duffield's claims that she did not knowingly agree to arbitrate her Title VII claims and that the NYSE arbitration system fails adequately to protect her statutory rights. While we have spoken previously in Lai and Renteria v. Prudential Ins. Co., 113 F.3d 1104 (9th Cir.1997), regarding the 1991 Act's "knowing" requirement, the parties in this case have emphasized the importance of the compulsory arbitration issue in se, and have vigorously contested that question throughout this proceeding. Likewise, several amici and the EEOC have urged that we determine the validity of compulsory arbitration provisions as applied to Title VII claims. Every amici, in fact, has addressed that issue, and we agree that the case is more appropriately resolved on that ground. Lastly, we need not consider Duffield's claim that Form U-4 is a contract of adhesion that is either unconscionable or beyond her reasonable expectations, see Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996); Graham v. Scissor-Tail, Inc., 28 Cal.3d 807, 817, 171 Cal.Rptr. 604, 623 P.2d 165 (1981), because she makes that argument also only with respect to her Title VII (and FEHA) claims
 
 
 [8]
 There was no Senate Committee Report, although another House Committee subsequently approved the identical bill without change. See H.R.Rep. No. 40(II) at 1, 102d Cong., 1st Sess. 78 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 694 (Judiciary Committee)
 
 
 [9]
 The only other circuit opinions to address the enforceability of individual employment agreements containing prospective waivers of the right to bring Title VII claims in court since the 1991 Act became effective, do not, for various reasons, consider the effect of the Act. See Paladino v. Avnet Computer Technologies, Inc., 134 F.3d 1054 (11th Cir.1998); Cole v. Burns Int'l Security Servs., 105 F.3d 1465 (D.C.Cir.1997); Rojas v. TK Communications, Inc., 87 F.3d 745 (5th Cir.1996)
 
 
 [10]
 Section 12212 of the ADA, which was passed in 1990, tracks almost verbatim § 118 of the 1991 Civil Rights Act. See 42 U.S.C. § 12212. It also has a legislative history similar to § 118 of the 1991 Civil Rights Act, indicating that Congress intended to codify in the ADA the protections of the Court's holding in Gardner-Denver. See, e.g., H.R. Conf. Rep. No. 596, 101st Cong., 2d Sess. 89 (1990), reprinted in 1990 U.S.C.C.A.N. 565, 598 ("It is the intent of the conferees that the use of these alternative dispute resolution procedures is completely voluntary."); H.R.Rep. No. 101-485(III) (1990), reprinted in 1990 U.S.C.C.A.N. 445, 499 (explaining that arbitration provision is intended to be consistent with Gardner-Denver ); see also infra at 26-31 (describing the 1991 Act's legislative history). It is also noteworthy that the Court had not yet even decided Gilmer when the ADA was enacted
 
 
 [11]
 Interestingly, when the District of Minnesota held that the 1991 Act did not prevent employers from compelling the arbitration of Title VII claims under Form U-4, it used the same approach as the Fourth Circuit--that is, it ignored an opinion signed by eight Justices and relied solely on a lone concurrence by Justice Scalia to disregard the 1991 Act's Committee Reports. See Johnson, 940 F.Supp. at 1458 (citing Blanchard v. Bergeron, 489 U.S. 87, 98-99, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (Scalia, J., concurring))
 
 
 [12]
 The Supreme Court recently granted certiorari in Wright v. Universal Maritime Serv. Corp., 121 F.3d 702 (4th Cir.1997) (table), cert. granted, --- U.S. ----, 118 S.Ct. 1162, 140 L.Ed.2d 174 (1998), to consider whether the Fourth Circuit was correct in holding, in line with Austin but contrary to seven other circuits, that Gardner-Denver is no longer the law. See 66 U.S.L.W. 3571 (March 3, 1998); Coleman v. Houston Lighting & Power Co., 984 F.Supp. 576, 582 (S.D.Tex.1997) (listing circuits that disagree with the Fourth Circuit)
 
 
 [13]
 It would also be at least a mild paradox to interpret § 118 as encouraging compulsory arbitration, when the section's other "encouraged" types of alternative dispute resolution--"settlement negotiations, conciliation, facilitation, mediation, factfinding, [and] minitrials"--are all consensual. Section 118; see Babbitt v. Sweet Home Chapter, 515 U.S. 687, 698 n. 11, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (stating that courts should, if possible, read a string of terms in a statute consistently so that they "reflect[ ] the broad purpose of the Act")
 
 
 [14]
 In view of Congress' repeated and unyielding pronouncements in the legislative histories of the ADA and the Civil Rights Act of 1991 that it sought to codify the Court's decision in Gardner-Denver, not Gilmer, we have some difficulty in understanding the Fourth Circuit's conclusion, after quickly discussing the Acts' legislative histories, that it "[does] not think that Congress intended to return to [Gardner-Denver ]." Austin, 78 F.3d at 882. That conclusion is contrary to the import of every statement congressional committees and members of Congress made during the Acts' legislative processes and overlooks the fact that Gilmer was not even decided when the ADA was enacted
 
 
 [15]
 In fact, that Congress declined to allow agreements to arbitrate Title VII claims as a condition of employment is made even more clear by the dissenting views on the bill expressed in the Committee minority report (authored by Rep. Hyde). In discussing the arbitration provision, the dissent lamented that, because § 118 encouraged only "voluntary" agreements, it was "nothing more than an empty promise" to those who wished to encourage arbitration of more Title VII claims. H.R.Rep. No. 40(II) at 78. If the arbitration provision had been thought to allow ex ante waivers as a condition of employment, there would have been absolutely no basis for the dissent's vigorous complaints
 
 
 [16]
 Robertson Stephens' other response to the legislative history is that even if it demonstrates that Congress intended to allow the enforcement only of "voluntary" agreements to arbitrate Title VII claims, Duffield's decision to sign Form U-4 was purely voluntary as that term is commonly understood. Whatever the merit of this dubious assertion, it is irrelevant here because our task is not to divine a literal meaning of the word "voluntary." Rather, it is to discover congressional intent. And, as we have explained in the text, Congress' intent was to preclude the enforceability of arbitration agreements imposed as a condition of employment
 
 
 [17]
 We recognize that an argument can be made that by its preference for Gardner-Denver, Congress intended only to preclude the use of adverse arbitration awards as a bar to the prosecution of Title VII actions. We conclude, however, for the reasons set forth in the text, that Congress did not wish to force victims of discrimination to submit to compulsory arbitration if they preferred to assert their Title VII claims directly in a judicial forum. To the contrary, we believe it clear that Congress intended that Title VII claimants have the right to go straight to court. See Pryner, 109 F.3d at 364-65; Varner v. National Super Markets, Inc., 94 F.3d 1209, 1213 (8th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997). Moreover, in this circuit we are precluded from adopting such a construction by Nghiem, in which we held that a Title VII claimant who voluntarily initiates arbitration proceedings is bound by an unfavorable award and may not thereafter seek to litigate his claim. See 25 F.3d at 1439-41
 
 
 [18]
 Furthermore, as we noted earlier, we express no view on the alternative procedure suggested in the proposed NASD rule change whereby individuals would be given the option at the time of employment to choose arbitration or litigation as the method of resolving future discrimination claims. See supra at 1187 & n. 1
 
 
 [19]
 Duffield's attempt to skirt this fact by asserting that prior to 1993 she was required by NYSE Rule 345(a) to register with an exchange and that federal law obligated each exchange to enforce its own rules, see 15 U.S.C. § 78(g)(1), is unavailing. That a NYSE rule, rather than any federal mandate, required Duffield to register with the exchange, removes the government's "responsibility" for the imposition of the arbitration requirement. See Blum, 457 U.S. at 1004, 102 S.Ct. 2777
 
 
 [20]
 As described supra in note 1, the NASD recently has voted to abolish its mandatory arbitration requirement with regard to employment discrimination claims. If the SEC refuses to approve this change for some reason, then state action might be present, because the government would be exercising at the least "significant encouragement" over the private entity's actions. Blum, 457 U.S. at 1004-05, 102 S.Ct. 2777. To date, however, the SEC has only acquiesced to NASD's and NYSE's mandatory arbitration rules. See infra section III.B