303 F.3d 994
 EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,
v.
LUCE, FORWARD, HAMILTON, & SCRIPPS, Defendant-Appellant.
Equal Employment Opportunity Commission, Plaintiff-Appellant,
v.
Luce, Forward, Hamilton, & Scripps, Defendant-Appellee.
 No. 00-57222.
 No. 01-55321.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 1, 2002.
 Filed September 3, 2002.
 
 COPYRIGHT MATERIAL OMITTED Charles A. Bird, Kelly Capen Douglas, Luce, Forward, Hamilton & Scripps LLP, San Diego, CA, for the defendant-appellant-appellee.
 Robert F. Walker, Paul, Hastings, Janofsky & Walker LLP, Los Angeles, CA, defendant-appellant-appellee.
 Dori K. Bernstein, Equal Employment Opportunity Commission, Washington, DC, for the plaintiff-appellee-appellant.
 Appeal from the United States District Court for the Central District of California; Florence Marie Cooper, District Judge, Presiding. D.C. No. CV-00-01322-FMC.
 Before PREGERSON and TROTT, Circuit Judges, and FITZGERALD, District Judge.*
 OPINION
 TROTT, Circuit Judge.
 
 
 1
 The law firm Luce, Forward, Hamilton & Scripps LLP ("Luce Forward") refused to hire Donald Scott Lagatree ("Lagatree") as a full-time legal secretary because he would not sign an agreement to arbitrate claims arising from his employment. On behalf of Lagatree, the Equal Employment Opportunity Commission ("EEOC") sued Luce Forward for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12203(b), the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(d), and the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 215(a)(3). The EEOC sought make-whole relief for Lagatree and a permanent injunction forbidding Luce Forward from requiring that employees sign arbitration agreements as a condition of employment.
 
 
 2
 The district court refused to award make-whole relief and rejected EEOC's request for an injunction based on the ADA, the ADEA, or the EPA. Relying on Duffield v. Robertson Stephens & Co., 144 F.3d 1182 (9th Cir.1998), however, the district court enjoined Luce Forward from requiring applicants to arbitrate Title VII claims and from enforcing existing agreements to arbitrate those claims.
 
 
 3
 We have jurisdiction over Luce Forward's timely appeal pursuant to 28 U.S.C. § 1291. In Circuit City Stores v. Adams, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), the Supreme Court implicitly overruled Duffield. Accordingly, we reverse the district court and hold that employers may require employees to sign agreements to arbitrate Title VII claims as a condition of their employment. We vacate the district court's permanent injunction against Luce Forward, which relied exclusively on Duffield for the contrary proposition. We additionally reject the EEOC's retaliation theory. Lagatree did not engage in a protected activity when he refused to sign the Luce Forward arbitration agreement, and consequently, Luce Forward did not retaliate by refusing to hire him.
 
 BACKGROUND
 
 4
 Lagatree applied for a position as a full-time legal secretary with Luce Forward in September 1997. Impressed with Lagatree's credentials and experience, Luce Forward extended to him a conditional offer of employment. On his first day of work, Luce Forward presented Lagatree with its standard offer letter, which set forth the terms and conditions of employment. The letter specified Lagatree's salary and benefits. His employment was at-will; "either[he] or the firm [could] terminate [his] employment at any time, with or without cause." The offer letter also included an arbitration provision requiring Lagatree to submit all "claims arising from or related to his employment" to binding arbitration. In its entirety, the Luce Forward arbitration agreement provided:
 
 
 5
 In the event of any dispute or claim between you and the firm (including employees, partners, agents, successors and assigns), including but not limited to claims arising from or related to your employment or the termination of your employment, we jointly agree to submit all such disputes or claims to confidential binding arbitration, under the Federal Arbitration Act. Any arbitration must be initiated within 180 days after the dispute or claim first arose, and will be heard before a retired State or Federal judge in the county containing the firm office in which you were last employed. The law of the State in which you last worked will apply.
 
 
 6
 Lagatree objected to the arbitration provision. He told Deborah Sweeney ("Sweeney"), a Luce Forward personnel employee, that he "couldn't sign ... the arbitration agreement" because "it was unfair." In his deposition, Lagatree clarified that he would not sign an arbitration agreement under an at-will employment situation because he believed he needed to keep in place his "civil liberties, including the right to a jury trial and redress of grievances through the government process." Sweeney then went to discuss the matter with Raymond W. Berry ("Berry"), the director of human resources at Luce Forward.
 
 
 7
 Lagatree worked for Luce Forward for two days without a contract while Luce Forward considered his vigorous objection to the arbitration provision. After those two days, Lagatree met with Berry and Sweeney. Lagatree asked whether Luce Forward "could strike" the arbitration provision from the offer letter. Berry responded that the arbitration agreement was a non-negotiable condition of employment at Luce Forward, and "if [Lagatree] didn't agree to ... signing that clause, then he would not be an employee of the firm." When Lagatree expressed his belief that "he didn't feel that it was right," Berry again "told him that[signing the arbitration provision] was the only way that he could stay — or become an employee of the firm." Initially, Lagatree agreed to sign the arbitration provision, but a short time later Lagatree refused to do so, and consequently, Luce Forward withdrew its job offer. It is undisputed that Luce Forward refused to hire Lagatree only because he would not sign the arbitration provision.
 
 
 8
 In February 1998, Lagatree sued Luce Forward in Los Angeles Superior Court accusing Luce Forward of wrongfully terminating his employment. Lagatree sought lost wages, damages for emotional distress, and punitive damages. The Superior Court granted Luce Forward's motion to dismiss, holding that Luce Forward did not unlawfully discharge Lagatree when he refused to sign a predispute arbitration agreement as a condition of employment. A California Court of Appeal affirmed, and the California Supreme Court denied review. Lagatree v. Luce, Forward, Hamilton & Scripps, 74 Cal. App.4th 1105, 88 Cal.Rptr.2d 664 (1999), review denied 2000 Cal. LEXIS 262, at *1 (Cal.2000).
 
 
 9
 While his state court suit was pending, Lagatree filed a complaint with the EEOC, alleging that he was wrongfully terminated for refusing to sign the Luce Forward arbitration provision. The EEOC sued Luce Forward on behalf of Lagatree and in the public interest, arguing that (1) Duffield forbade Luce Forward from requiring Lagatree to sign an arbitration agreement, and (2) by refusing to hire Lagatree, Luce Forward unlawfully retaliated against him for asserting his constitutional right to a jury trial. The EEOC sought make-whole relief for Lagatree, including "rightful place employment," back wages and benefits, and compensatory and punitive damages. The EEOC sought also a permanent injunction forbidding Luce Forward from engaging in unlawful retaliation and ordering Luce Forward to "desist from utilizing mandatory arbitration agreements."
 
 
 10
 The district court denied any award of damages on behalf of Lagatree. Considering itself bound by Duffield, however, the district court felt it was "required to issue an injunction prohibiting [Luce Forward] from requiring its employees to agree to arbitrate their Title VII claims as a condition of employment and from attempting to enforce any such previously executed agreements." The district court did not issue an injunction forbidding compulsory arbitration of ADA, ADEA or EPA claims. Nor did the district court expressly rule on the EEOC's retaliation theory. Luce Forward timely appealed the district court's injunction. The EEOC cross-appealed, seeking to enjoin Luce Forward from engaging in an "unlawful retaliatory practice by denying employment to any applicant... who refuses to waive his right to participate in statutorily protected [] proceedings."
 
 STANDARD OF REVIEW
 
 11
 We review de novo the district court's grant of summary judgment. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).
 
 DISCUSSION
 I DUFFIELD
 
 12
 An employer may not discriminate against "an employee or applicant for employment because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1) (Title VII), "disability," 42 U.S.C. § 12112(a)(ADA), or "age." 42 U.S.C. § 623(a)(1) (ADEA). The EPA makes it unlawful to pay lower wages on the basis of an employee's sex. 29 U.S.C. § 206(d)(1).
 
 
 13
 The Civil Rights Act of 1991 ("the Act") strengthened Title VII by making it easier to bring and to prove lawsuits and by expanding the available judicial remedies so that plaintiffs could receive full compensation for injuries resulting from discrimination. H.R. Rep. No. 102-40(I), at 30 (1991), reprinted in 1991 U.S.S.C.A.N. 694, 694-96. The Act also included a "polite bow to the popularity of alternative dispute resolution," as governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. Pryner v. Tractor Supply Co., 109 F.3d 354, 363 (7th Cir.1997). Specifically, § 118 of the Act provided that "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration is encouraged to resolve disputes arising under this chapter." Pub. L. No. 102-166, 105 Stat. 1071 § 118 reprinted in notes to 42 U.S.C. § 1981 ("Section 118"); Cf. 42 U.S.C. § 12212 ("Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration is encouraged to resolve disputes arising under this chapter.").
 
 
 14
 Congress passed § 118 against the backdrop of the Supreme Court's decision in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In that case, the Court held that an employer could compel arbitration of an employee's ADEA claim pursuant to an arbitration provision required as a condition of his employment. The Court recognized that arbitration did not hinder the discrimination plaintiff's ability to vindicate her rights: "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral forum, rather than a judicial forum." Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).[1] By this language, the Court judicially sanctioned the liberal federal policy favoring arbitration.
 
 
 15
 Despite the Supreme Court's decision in Gilmer and Congress's seemingly perspicuous language that § 118 encourages arbitration, we determined in Duffield that Congress intended to exempt Title VII claims from compulsory arbitration. 144 F.3d at 1185. In Duffield, Robertson Stephens required Tonya Duffield, "like every other individual who wishes to work in the United States as a broker-dealer in the securities industry, to agree to arbitrate all disputes arising from her employment." Id. Duffield signed her employment contract without objection and began working as a broker-dealer for Robertson Stephens. Id. at 1186.
 
 
 16
 Duffield subsequently sued Robertson Stephens for sexual discrimination and sexual harassment in violation of Title VII and California's Fair Employment & Housing Act ("FEHA"). Robertson Stephens sought to compel arbitration pursuant to the compulsory arbitration provision in Duffield's employment contract, while Duffield sought a declaration that the compulsory arbitration provision was unenforceable. The district court rejected Duffield's arguments and granted Robertson Stephen's motion to compel.
 
 
 17
 On appeal, we reversed the district court's order compelling arbitration. The opening paragraph of our opinion succinctly presented the issue for review: "[W]hether employers may require as a mandatory condition of employment ... that all employees waive their right to bring Title VII and other statutory and non-statutory claims in court and instead agree in advance to submit all employment-related disputes to binding arbitration." Id. at 1185. We believed that the answer to this question was potentially dispositive of whether Robertson Stephens could enforce the compulsory arbitration agreement signed by Duffield. As we approached the case: (1) if Robertson Stephens could not require Duffield to sign an arbitration agreement as a condition of her employment, it surely could not enforce the agreement against her; whereas (2) if Robertson Stephens could require Duffield to sign an arbitration agreement as a condition of her employment, that agreement might be enforceable subject to the constraints of traditional contract law. See, e.g., First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("apply[ing] ordinary statelaw principles that govern the formation of contracts" determining the validity of an agreement to arbitrate); Ferguson v. Countrywide Credit Indus., 298 F.3d 778, 784-85 (9th Cir.2002) (refusing compulsory arbitration of Title VII claims where arbitration agreement was unconscionable); Circuit City Stores, Inc. v. Najd, 294 F.3d 1104, 1108 (9th Cir.2002) (allowing arbitration); Circuit City Stores v. Ahmed, 283 F.3d 1198, 1199 (9th Cir.2002) (allowing compulsory arbitration of FEHA claims where agreement was not unconscionable); Prudential Ins. Co. v. Lai, 42 F.3d 1299, 1305 (9th Cir.1994) (refusing compulsory arbitration where plaintiff did not knowingly agree to arbitrate).
 
 
 18
 At the outset of Duffield, we observed that reading § 118 to allow compulsory arbitration of Title VII claims was "at odds with" Congress's directive that Title VII be read broadly to effectuate its remedial purposes. 144 F.3d at 1192. We thought it "at least a mild paradox" that the Act, which expanded remedies for victims of discrimination, encouraged the use of a process whereby employers condition employment on their prospective employees' surrendering of their rights to a judicial forum. Id. at 1192-93 (quoting Pryner, 109 F.3d at 363). These observations established the opinion's foundation.
 
 
 19
 Building on this foundation, the Court undertook an exercise in statutory interpretation, commencing with an examination of § 118's plain language. The Duffield Court determined that, in context, Congress's pronouncement in § 118 that "arbitration is encouraged to resolve disputes arising under [Title VII]" was ambiguous "at a minimum." Duffield, 144 F.3d at 1193. To clarify this ambiguity, the Court turned to § 118's legislative history. After picking and choosing snippets of legislative history consistent with its desired result, which the dissent sets forth "at some length," the Court concluded that § 118 codified the law as it was understood before Gilmer — that employers could not compel prospective employees to forego their right to litigate Title VII claims in a judicial forum as a condition of employment. Id. at 1199. Accordingly, the Duffield Court held that "under the Civil Rights Act of 1991, employers may not [through compulsory arbitration agreements] compel individuals to waive their Title VII right to a judicial forum." Id. at 1185. As Robertson Stephens could not require Duffield to sign an arbitration agreement as a condition of her employment, the Court refused to enforce the arbitration agreement that she signed. Id. at 1199 ("In view of the fact that the context, language, and legislative history of the 1991 Act together make out a conclusive case, that Congress intended to preclude compulsory arbitration of Title VII claims, we think it inescapable that [Duffield's arbitration agreement] is unenforceable as applied to such claims.").
 
 
 20
 Those seeking to distinguish Duffield assert that it addressed only whether an employer may enforce compulsory arbitration of Title VII claims against its employees. See Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1315 (11th Cir.2002) ("[Duffield]... stand[s] for the proposition that compulsory arbitration agreements are `unenforceable' or are `inconsistent' with Title VII."); Borg-Warner Protective Servs. Corp. v. EEOC, 245 F.3d 831, 835 (D.C.Cir. 2001) ("Duffield ruled only that such agreements are `unenforceable' with respect to Title VII claims."). We respectfully disagree with these narrow assessments. The Duffield Court decided whether an employer could require compulsory arbitration as a condition of employment — a question it believed dispositive of the entire case. The latter portions of Duffield which concluded that the arbitration agreement was unenforceable simply express the inevitable consequence of holding that employers may not require arbitration of Title VII claims as a condition of employment. See, e.g., id. at 1199. ("The contract before us [] requires compulsory arbitration ... and it is contracts of that nature we are compelled to hold unenforceable....").
 
 
 21
 While Duffield properly considered whether an employer could require that an employee sign a compulsory arbitration agreement as a condition of employment, arguably its outcome was at odds with existing Circuit authority. In Mago v. Shearson Lehman Hutton Inc., 956 F.2d 932, 935 (9th Cir.1992), we held that Congress did not intend to preclude arbitration of Title VII claims. The Mago Court extended Gilmer to Title VII claims, finding probative the similarities between the ADEA and Title VII. Id. Mago, however, did not interpret (or even mention) § 118, even though Mago was decided months after its passage.
 
 
 22
 Later in Lai, we observed: "Gilmer ... made it clear that the ADEA does not bar agreements to arbitrate federal age discrimination in employment claims. Our Circuit has extended Gilmer to employment discrimination claims brought under Title VII." Lai, 42 F.3d at 1303 (citing Mago) (emphasis added); see also id. ("The issue before us, however, is not whether employees may ever agree to arbitrate statutory employment claims; they can."). Lai discussed § 118, and contrary to Duffield, concluded that Congress intended to allow arbitration of Title VII claims "where the parties knowingly and voluntarily elect to use these methods." 42 F.3d at 1304-05 (citing H.R.Rep. No. 102-40(I) (1991), reprinted in 1991 U.S.C.C.A.N. 549, 635 (statement of Sen. Dole)). Although Duffield cited both Mago and Lai, it did not address these decisions' express statements that Gilmer and § 118 authorized compulsory arbitration of Title VII claims.
 
 
 23
 Since our Duffield decision in 1998, our Sister Circuits as well as the Supreme Courts of California and Nevada have unanimously repudiated its holding. See, e.g., Desiderio v. Nat'l Assoc. of Sec. Dealers, Inc., 191 F.3d 198, 206 (2d Cir.1999) (referring to Duffield's reasoning as "the poet's lament"); Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 7 (1st Cir.1999); Koveleskie v. SBC Capital Mkts., Inc., 167 F.3d 361, 365 (7th Cir.1999) ("We respectfully disagree with the Ninth Circuit on this issue...."); Seus v. John Nuveen & Co., 146 F.3d 175, 182 (3d Cir.1998); Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 837 (8th Cir.1997); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1482-83 (D.C.Cir.1997); Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 882 (4th Cir. 1996); Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1487 (10th Cir.1994); Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698, 700 (11th Cir. 1992); Alford, 939 F.2d at 230; Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 307 (6th Cir.1991); see also Armendariz v. Foundation Health Psychcare Servs., 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 675-76 (2000) ("Aside from the fact Duffield is a minority of one, we find its reasoning unpersuasive."); Kindred v. Second Judicial Dist., 116 Nev. 405, 996 P.2d 903, 906 (2000). Duffield, like Bikini Atoll, now sits ignominiously alone awaiting remediation.
 
 
 24
 That remediation can occur, however, only if a decision of the Supreme Court permits us to question Duffield. See United States v. Gay, 967 F.2d 322, 327 (9th Cir.1992) ("As a general rule, one three-judge panel of this court cannot reconsider or overrule the decision of a prior panel. An exception to this rule arises when an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit....") (internal citations and quotations omitted). In Circuit City, the Supreme Court so directly undermined the reasoning behind Duffield, that we conclude it has lost its status as valid precedent.
 
 
 25
 In Circuit City, the Supreme Court reviewed our decision in Craft v. Campbell Soup Co., 177 F.3d 1083 (9th Cir.1998) (per curiam), in which we held that the FAA was not applicable to any contract of employment. The Supreme Court disagreed with Craft's conclusion, clarifying that the FAA covered all employment contracts except those of transportation workers. Circuit City, 532 U.S. at 119, 121 S.Ct. 1302. In the process, the Court described the "real benefits to the enforcement of arbitration provisions," including lower costs and easy choice-of-law resolution, and it rejected "the supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context." Id. at 122-23, 121 S.Ct. 1302. Most importantly, the Court believed it had "been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law ...; by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum." Id.
 
 
 26
 Although Circuit City did not repudiate Duffield by name, the Supreme Court's language and reasoning decimated Duffield's conclusion that Congress intended to preclude compulsory arbitration of Title VII claims. In particular, Circuit City's unambiguous proclamation that "arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law" cannot be reconciled with Duffield's holding that Congress intended Title VII, one such "congressional enactment," to preclude compulsory arbitration of discrimination claims.[2] Circuit City, 532 U.S. at 122-23, 121 S.Ct. 1302.
 
 
 27
 Similarly, the Supreme Court's emphatic reminder that the right to a judicial forum is not a substantive right contradicts Duffield's fundamental supposition that the Act guaranteed a nonwaivable, substantive right to a jury trial.[3] Compare Circuit City, 532 U.S. at 122-23, 121 S.Ct. 1302 ("[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by statute; it only submits to their resolution in an arbitral, rather than a judicial forum.") with Duffield, 144 F.3d at 1185 ("[U]nder the Civil Rights Act of 1991, employers may not [through compulsory arbitration agreements] compel individuals to waive their Title VII right to a judicial forum.") (emphasis added). In effect, Circuit City recognized that an aggrieved employee does not lose anything by resolving his grievances in an arbitral forum, where he may demand the "specific protection" against discrimination afforded by federal law, including Title VII. Circuit City, 532 U.S. at 123, 121 S.Ct. 1302.
 
 
 28
 Instead of trying to salvage Duffield by creatively reconciling these inconsistencies as "different" yet "compatible holdings," we reach the inevitable conclusion that Duffield no longer remains good law.[4] We regard Duffield as within the category of "fruitful error."[5] In Duffield's stead, we hold that an employer may require employees to arbitrate Title VII claims as a condition of employment. Our decision is consistent with the Supreme Court's language and reasoning in Circuit City. It also unifies Ninth Circuit case law and brings us in line with our Sister Circuits and the Supreme Courts of California and Nevada. We note also that it is consistent with Congress's pronouncement in § 118 that "arbitration is encouraged to resolve disputes arising under [Title VII]."[6] Of course, not all compulsory arbitration agreements will be enforced; they must still comply with the principles of traditional contract law, including the doctrine of unconscionability.
 
 
 29
 Our decision today should not impact the EEOC's mission at all. As the Supreme Court recently explained in EEOC v. Waffle House, Inc., 534 U.S. 279, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002), a compulsory arbitration agreement between an employer and an employee does not prevent the employee from filing a complaint with the EEOC. Nor does such an agreement bind the EEOC to an arbitral forum because the EEOC is not a party to that agreement. Id. Thus, even if an employee must arbitrate her Title VII claims pursuant to a compulsory arbitration agreement, the EEOC, in its ombudsman's role, remains free to seek appropriate victim-specific relief in any suitable forum. Id. at 769.
 
 
 30
 Without further ado, we vacate the district court's Duffield-based permanent injunction. Compelled by the Supreme Court's decision in Circuit City, we conclude that Duffield no longer remains good law. Luce Forward may require appropriate compulsory arbitration of its applicants and employees as a condition of employment. In addition, Luce Forward may enforce those arbitration agreements against current employees, as long as the arbitration agreements comply with traditional principles of contract law.
 
 II RETALIATION
 
 31
 Although the EEOC asserts that Circuit City did not implicitly overrule Duffield and that Duffield remains the law of the Circuit, the EEOC, nevertheless, does not place all its eggs in Duffield's basket. In fact, the EEOC primarily argues that Luce Forward unlawfully retaliated against Lagatree by not hiring him after he refused to sign Luce Forward's compulsory arbitration agreement.
 
 
 32
 The federal laws prohibiting employment discrimination make it unlawful for an employer to retaliate against an applicant or employee because she has engaged in a protected activity. See 42 U.S.C. § 2000e-3(a) (Title VII);[7] 42 U.S.C. § 12203(a)(ADA); 29 U.S.C. § 623(d) (ADEA); 29 U.S.C. § 215(a)(3)(EPA). To establish retaliation, the EEOC, on Lagatree's behalf, must prove that: (1) Lagatree engaged in a protected activity; (2) Lagatree suffered an adverse employment decision; and (3) there was a causal link between Lagatree's activity and the adverse employment decision. See Hashimoto v. Dalton, 118 F.3d 671, 679 (9th Cir.1997). Protected activities include: (1) opposing an unlawful employment practice; and (2) participating in a statutorily authorized proceeding. Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir.1978).
 
 
 33
 In this case, it is undisputed that Lagatree suffered an adverse employment decision when Luce Forward refrained from hiring him because he refused to sign Luce Forward's compulsory arbitration agreement. Luce Forward contests only whether Lagatree engaged in a protected activity when he refused to sign the arbitration agreement. See Jurado v. Eleven-Fifty Corp., 813 F.2d 1406, 1411 (9th Cir.1987) (finding adverse employment action and causal link were undisputed and only question was whether employee engaged in protected opposition conduct); EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1011-12 (9th Cir.1983) (same).
 
 A. Opposing an Unlawful Employment Practice
 
 34
 Lagatree's refusal to sign Luce Forward's compulsory arbitration agreement was not protected opposition conduct. Title VII's statutory "opposition clause" prohibits an employer from retaliating against an applicant or employee "because he has opposed any practice made an unlawful employment practice." See 42 U.S.C. § 2000e-3(a) (Title VII); see also 29 U.S.C. § 623(d) (ADEA); 42 U.S.C. § 12203(a)(ADA). It is not necessary that the policy opposed be demonstrably unlawful. Crown Zellerbach, 720 F.2d at 1013. If the employee's refusal to accede to an employer's policy is based on a reasonable belief that the policy is unlawful, the employee's conduct is a protected manner of opposition. See, e.g., Passantino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 506 (9th Cir.2000) ("Title VII allows employees to freely report actions that they reasonably believe are discriminatory, even if those actions are in fact lawful.").
 
 
 35
 In September 1997, however, when Lagatree refused to sign Luce Forward's compulsory arbitration agreement as a condition of his employment, he could not have reasonably believed that Luce Forward's arbitration policy was an unlawful employment practice. Indeed, on May 13, 1991, six years before Lagatree's stint at Luce Forward, the Supreme Court in Gilmer expressly permitted requiring compulsory arbitration of ADEA claims as a condition of employment. In addition, Congress amended Title VII with § 118 to provide explicitly that "arbitration is encouraged to resolve disputes arising under [Title VII]." Subsequently, in 1994, Lai extended the rationale of Gilmer to employment discrimination claims brought under Title VII. 42 F.3d at 1303. Finally, by 1997, at least five of our Sister Circuits had interpreted § 118 to permit compulsory arbitration of Title VII claims. Until Duffield was decided May, 13, 1998 — nearly a year after Lagatree's refusal of Luce Forward's employment offer — no Court of Appeals had concluded that § 118 forbade compulsory arbitration of Title VII claims. Cf. Weeks, 291 F.3d at 1312 (holding refusal to sign a compulsory arbitration agreement in 1999 was not protected opposition conduct because reliance on Duffield was not objectively reasonable). In the face of voluminous contrary legal precedent, Lagatree could not have reasonably believed Luce Forward was engaged in unlawful activity when it required arbitration as a condition of employment.
 
 
 36
 In addition, Lagatree could not have reasonably interpreted the text of any relevant federal statute to forbid compulsory arbitration. The EEOC argues that Lagatree's refusal to waive his procedural right to file or litigate a civil suit was protected opposition conduct because the ADA makes it "unlawful to coerce ... or interfere with any individual in the exercise or enjoyment of ... any right granted or protected by this chapter." 42 U.S.C. § 12203(b) (emphasis added). The EEOC's argument, however, assumes contrary to Supreme Court precedent that the right to a judicial forum is a substantive right guaranteed by the ADA.
 
 
 37
 By 1997, the Supreme Court had held repeatedly that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral rather than a judicial forum." Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (quoting Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346). By this language, the Supreme Court distinguished between the substantive rights guaranteed by the statute and the right to a judicial forum.
 
 
 38
 Moreover, glaringly absent from the EEOC's argument is any express statutory indication that arbitration of ADA claims (or any other employment discrimination claims) is disfavored. Section 12203 does not mention arbitration at all, and another section of the ADA, 42 U.S.C. § 12212, like § 118 of Title VII, provides that "arbitration is encouraged to resolve disputes."
 
 
 39
 Lagatree could not have reasonably interpreted the ADA's pronouncement that "arbitration is encouraged" to mean that "compulsory arbitration as a condition of employment is forbidden." The EEOC fails to identify a single case from any Circuit that would have supported Lagatree's refusal to sign Luce Forward's compulsory arbitration agreement. Because Lagatree could not have reasonably believed that Luce Forward's policy of requiring arbitration was an unlawful employment practice, his opposition to that policy was not protected opposition conduct. Thus, as a matter of law Luce Forward's refusal to hire Lagatree for not signing a compulsory arbitration agreement was not illegal retaliation.
 
 
 40
 B. Participating in a Statutorily Authorized Proceeding
 
 
 41
 By refusing to sign Luce Forward's compulsory arbitration agreement, Lagatree was not participating in a statutorily authorized proceeding. Title VII, the ADA, and the ADEA make it unlawful for an employer to discriminate or retaliate against an employee or an applicant for employment because that person "has made a charge, testified, assisted, or participated in any manner in a ... proceeding." 42 U.S.C. § 2000e-3(a) (Title VII); 42 U.S.C. § 12203(a)(ADA); 29 U.S.C. § 623(d) (ADEA). The EPA similarly makes it unlawful for an employer to discriminate or retaliate against any employee because such employee has "instituted or caused to be instituted a proceeding under or related the [the EPA], or has testified or is about to testify in any such proceeding." 29 U.S.C. § 215(a)(3). A covered "proceeding" undoubtedly includes instituting "a civil action ... in a court of competent jurisdiction." 42 U.S.C. §§ 2000e-5(f)(1), (3) (Title VII); 42 U.S.C. § 12117(a)(ADA); 29 U.S.C. § 626(c)(1) (ADEA); 29 U.S.C. § 216(b)(EPA). An individual who files a civil action has "participated in any manner" in a covered proceeding; thus an employer may not retaliate against that individual.
 
 
 42
 The statutory protections against retaliation also extend to an applicant or an employee who informs his employer of his intention to participate in a statutory proceeding, even if he has not yet done so. See Gifford v. Atchison, Topeka, & Santa Fe Ry. Co., 685 F.2d 1149, 1155-56 (9th Cir.1982) (holding employee states a retaliation claim after being fired for writing a letter threatening an EEOC charge). In Gifford, we saw no "legal distinction ... between the filing of a charge which is clearly protected ... and threatening to file a charge." Id. at 1156 n. 3.
 
 
 43
 Here, the EEOC argues that Luce Forward cannot refuse to hire Lagatree because, although he did not file or threaten a civil action, he reserved his right to bring a civil action in a judicial forum. EEOC completes its argument as follows:
 
 
 44
 [Luce Forward]'s practice of refusing to employ any individual who will not sign the compulsory waiver ... is effectively a preemptive strike against future participation conduct afforded absolute protection under each of the federal anti-retaliation provisions. Rather than wait for an employee to file or litigate a suit under a federal rights law, or to announce his intention to do so — at which point the employee unquestionably would be statutorily protected from any retaliatory adverse treatment, Luce Forward preemptively denies employment to any individual who will not waive his right to engage in such protected participation activity.
 
 
 45
 Critical to the EEOC's position is the notion that Lagatree's right to a judicial forum is "afforded absolute protection under each of the federal anti-retaliation provisions." That notion, and thus the EEOC's entire position, lacks merit.
 
 
 46
 Although Lagatree undoubtedly retained the right to be free from discrimination, a right he could not prospectively waive, see, e.g., 29 U.S.C. § 626(f)(c), no federal law guaranteed him the ability to vindicate that right in a judicial forum. In fact, the Supreme Court in Gilmer condoned compulsory arbitration of ADEA claims as a condition of employment. Reaffirming Gilmer, in Circuit City, the Supreme Court extolled the advantages of arbitrating employment discrimination claims and rejected the "supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context." 532 U.S. at 123, 121 S.Ct. 1302. Most importantly, the Supreme Court clarified that the right to a judicial forum was not a substantive right: "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum." Id.
 
 
 47
 Waiving the right to a judicial forum is unlike signing a "yellow dog contract," by which an employer forbids an employee from joining a union. An employee's right to join a union is a substantive right guaranteed by the National Labor Relations Act, 29 U.S.C. § 151. No statute, however, forbids the compulsory waiver of a judicial forum, and thus demanding its waiver is not illegal. While Congress might have forbidden arbitration of employment discrimination claims, instead, it "encouraged" their arbitration.
 
 
 48
 Along with his experience and credentials, the privilege of a judicial forum was a valuable asset Lagatree brought to the negotiating table. During negotiations, Luce Forward offered Lagatree a base salary of $3,600/month plus substantial benefits in return for his services and his agreement to arbitrate employment-related disputes. Lagatree objected to Luce Forward's demand of arbitration and counteroffered, asking that Luce Forward waive its compulsory arbitration requirement. Luce Forward refused to waive compulsory arbitration, and Lagatree initially decided to accept Luce Forward's terms of employment. When Lagatree ultimately refused to agree to Luce Forward's terms of employment, he simply made a rational economic decision that Luce Forward was asking too much and offering too little in return. But Luce Forward incurred no liability as a result of these failed negotiations; it only lost the potential services of a qualified applicant. Indeed, dickering over freely waivable rights is not a protected activity, and the failure to agree to the terms of an employment contract is not retaliation.
 
 CONCLUSION
 
 49
 Circuit City implicitly overruled Duffield, and therefore, we vacate the district court's permanent injunction, which relied on Duffield. We hold that Luce Forward could require Lagatree to arbitrate potential Title VII claims as a condition of his employment. When Lagatree refused to sign the arbitration agreement, Luce Forward's refusal to hire him was not unlawful retaliation because Lagatree's right to a judicial forum is not afforded absolute protection under any federal statute.
 
 
 50
 VACATED; REMANDED TO THE DISTRICT COURT FOR JUDGMENT TO BE ENTERED IN FAVOR OF LUCE FORWARD.
 
 
 
 Notes:
 
 
 *
 The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 In the wake ofGilmer, the Supreme Court vacated and remanded the Fifth Circuit's decision in Alford v. Dean Witter Reynolds, Inc., which had held that an employee was not required to arbitrate her Title VII sex discrimination and sexual harassment claims despite having signed a compulsory arbitration agreement. 905 F.2d 104 (5th Cir.1990), vacated by 500 U.S. 930, 111 S.Ct. 2050, 114 L.Ed.2d 456 (1991) ("The judgment is vacated and the case is remanded to the ... Fifth Circuit for further consideration in light of Gilmer...."). The Fifth Circuit reversed itself, holding that Title VII claims may be arbitrated pursuant to a compulsory agreement. Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229, 230 (5th Cir.1991).
 
 
 [2]
 The dissent claims we ignore the import of the word "compulsory" which it equates with "coercive" employer conduct. We do no such thing. However, instead of categorically prohibiting all so-called "compulsory" arbitration agreements, as the dissent would do, we police truly "coercive" employer conduct through the application of traditional contract law principles, including unconscionability, which specifically examines the question of coercionSee e.g., Armendariz v. Found. Health Psychcare Serv. Inc., 24 Cal.4th 83, 113-22, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000).
 
 
 [3]
 The dissent citesMelton v. Philip Morris, Inc., No. Civ. 01-93-KI, 2001 WL 1105046, at *3 (D.Or. Aug. 9, 2001), for the proposition that Duffield "was not premised ... on the arbitral forum causing a loss of substantive rights," but amazingly neglects to consider or explain Duffield's own language to the contrary. See, e.g., Duffield, 144 F.3d at 1185.
 
 
 [4]
 It seems our remedial efforts arrived not a moment too soon. Our own Court has begun to hack away atDuffield's viability. See Circuit City Stores v. Najd, 294 F.3d 1104, 1106-07 (9th Cir.2002) ("Duffield's continued validity is questionable."). Our Sister Circuits have also begun to undermine Duffield. Weeks, 291 F.3d at 1315 ("Further, the viability of Duffield has been recognized to be in considerable doubt in light of the later decided Circuit City."); Borg-Warner, 245 F.3d at 835 ("We cannot say whether the Ninth Circuit will continue to adhere to Duffield in the face of the Supreme Court's Circuit City decision."). More noteworthy, perhaps, our district courts are adrift, wondering whether Duffield remains valid precedent. Four district court opinions have held that Circuit City implicitly overruled Duffield. Farac v. Permanente Med. Group, 186 F.Supp.2d 1042, 1045 (N.D.Cal.2002) ("Circuit City implicitly overruled Duffield."); Eftekhari v. Peregrine Fin. & Sec., Inc., No. C 00-3594 JL, 2001 U.S. Dist. LEXIS 16087, at *25, 2001 WL 1180640 (N.D.Cal. September 24, 2001); Olivares v. Hispanic Broad. Corp., No. CV 00-00354-ER, 2001 U.S. Dist. LEXIS 5760, at *1-2, 2001 WL 477171 (C.D. Cal. April 26, 2001); Scott v. Burns Int'l Sec. Servs., Inc., 165 F.Supp.2d 1133, 1137 (D.Hawai'i 2001) ("The Supreme Court's contrary statement in Circuit City that arbitration agreements do not contravene the policies of congressional enactments of the protections of federal law ... implicitly overrules... Duffield."). However, three district court opinions have expressed the contrary view that Duffield remains valid precedent. Circuit City Stores v. Banyasz, No. C-01-3106 WHO, 2001 U.S. Dist. LEXIS 16953, at *6-8, 2001 WL 1218406 (N.D.Cal. Oct. 11, 2001); Melton, 2001 U.S. Dist. LEXIS, at *6-9, 2001 WL 1105046 (D.Or. Aug. 9, 2001); Ferguson v. Countrywide Credit Indus., Inc., No. CV00-13096AHM(CTX), 2001 U.S. Dist. LEXIS, 2001 WL 867103 (C.D.Cal. Apr. 23, 2001) aff'd on other grounds 298 F.3d 778 (9th Cir. 2002) (Pregerson J.).
 
 
 [5]
 To quote the recently-departed polymath, Stephen J. Gould, "[a]s the great Italian economist Vilfredo Pareto wrote: `Give me a fruitful error any time, full of seeds, bursting with its own corrections. You can keep your sterile truth for yourself.'" Stephen J. Gould,The Panda's Thumb, 244 (1980).
 
 
 [6]
 "We do not resort to legislative history to cloud a statutory text that is clear."Circuit City, 532 U.S. at 119, 121 S.Ct. 1302 (quoting Ratzlaf v. United States, 510 U.S. 135, 147-48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)).
 
 
 [7]
 All the federal anti-discrimination statutes contain similar provisions forbidding retaliation. By way of representative example, Title VII, 42 U.S.C. § 2000e-3, provides:
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment... because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 
 
 
 51
 PREGERSON, Circuit Judge, Dissenting.
 
 
 52
 I respectfully dissent. The majority concludes that in Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), the Supreme Court "implicitly overruled" Duffield v. Robertson Stephens & Co., 144 F.3d 1182 (9th Cir.1998). Maj. op. at 996-97. For the following reasons, I would find that Duffield remains good law.
 
 I.
 
 53
 The issue in Duffield was whether employers may require their employees, as a mandatory condition of employment, to agree to arbitrate future Title VII claims. See Duffield, 144 F.3d at 1185. Based on an analysis of Congress' intent when it amended Title VII through the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991), we held that employers may not require employees, as a mandatory condition of employment, to agree to arbitrate future Title VII claims. See Duffield, 144 F.3d at 1189-90.
 
 
 54
 The issue in Circuit City was whether the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., excludes from its coverage not only employment arbitration agreements by transportation workers, but also employment arbitration agreements by non-transportation workers. See Circuit City, 532 U.S. at 109, 121 S.Ct. 1302. Without mentioning Duffield, Title VII, or the Civil Rights Act of 1991, the Supreme Court held that the FAA excludes from its coverage employment arbitration agreement by transportation workers, but not employment arbitration agreements by non-transportation workers. See Circuit City, 532 U.S. at 109, 121 S.Ct. 1302.
 
 
 55
 Duffield and Circuit City are cases of the proverbial apples and oranges: different law, different issues, and different, yet compatible holdings. Most importantly, when the Supreme Court concluded in Circuit City that the FAA covers employment arbitration agreements by non-transportation workers, it did not also implicitly conclude, contra Duffield, that employers may require their employees, as a mandatory condition of employment, to agree to arbitrate future Title VII claims. Whether the FAA covers employment arbitration agreements by non-transportation workers — the issue in Circuit City — is one question. Whether an employer may require an employee, as a mandatory condition of employment, to agree to arbitrate future Title VII claims — the issue in Duffield — is an entirely different question. In answering "yes" to the first question, Circuit City did not also implicitly answer "yes" to the second question. "Arbitration under the [FAA] is a matter of consent, not coercion...." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). It is entirely consistent to hold — as the Supreme Court did in Circuit City — that non-transportation workers who consent in advance to arbitration can later be held to that agreement under the FAA, and to also hold — as we did in Duffield — that employers may not compel their employees to enter arbitration agreements under Title VII. Accordingly, Duffield remains good law after Circuit City, and the District Court's injunction modeled on Duffield should be affirmed.
 
 II.
 
 56
 The majority advances two arguments in support of its conclusion that Circuit City "implicitly overruled" Duffield. Both arguments are unconvincing.
 
 A.
 
 57
 First, the majority relies on dicta in Circuit City that "arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law." Maj. op. at 1002 (quoting Circuit City, 532 U.S. at 123, 121 S.Ct. 1302) (emphasis added).[1] The majority claims that this "unambiguous proclamation... cannot be reconciled with Duffield's holding that Congress intended Title VII to preclude compulsory arbitration of discrimination claims." Maj. op. at 1003 (citing Circuit City, 532 U.S. at 123, 121 S.Ct. 1302) (footnote omitted, emphasis added). In reality, there is no contradiction whatsoever between the Circuit City dicta and the Duffield holding.
 
 
 58
 In perceiving a contradiction between the Circuit City dicta and the Duffield holding, the majority ignores a crucial word in the Duffield holding: "compulsory." In Duffield, we referred to arbitration agreements as compulsory "when individuals must sign an agreement waiving their rights to litigate future claims in a judicial forum in order to obtain employment with, or continue to work for, the employer." See 144 F.3d at 1187.[2] The Supreme Court said in Circuit City only that, generally, employees who have agreed to arbitrate future claims under federal anti-discrimination law can be held to such arbitration agreements without violating the policies of federal anti-discrimination law. The Supreme Court did not also say in Circuit City — contra Duffield — that employees can be required, as a mandatory condition of employment, to agree to arbitrate future claims under federal anti-discrimination law without violating the policies of federal anti-discrimination law. Nor is the second statement implied in the first. Perhaps more importantly, the Circuit City dicta that enforcement of arbitration agreements can be compatible with the policies of federal anti-discrimination law does not contradict the Duffield holding that in the case of Title VII, enforcement of compulsory arbitration agreements is always incompatible with the text and legislative history of the § 118 of Civil Rights Act of 1991.
 
 
 59
 We reached our holding in Duffield after closely following instructions set forth by the Supreme Court in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) in the context of another federal anti-discrimination law, the Age Discrimination in Employment Act ("ADEA"). In Gilmer, the Supreme Court first reiterated that "`[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" 500 U.S. at 26, 111 S.Ct. 1647 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)) (alteration in original). The Supreme Court then placed the burden on the plaintiff, who sought to avoid arbitration of his ADEA claim as per agreement, "to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims." Id. The Supreme Court observed that "[i]f such an intention exists, it will be discoverable in the text of the ADEA, its legislative history, or an `inherent conflict' between arbitration and the ADEA's underlying purposes." Id. The Supreme Court examined the ADEA in this regard and held that the plaintiff "ha[d] not met his burden of showing that Congress, in enacting the ADEA, intended to preclude arbitration of claims under that Act." Id. at 35, 111 S.Ct. 1647.[3]
 
 
 60
 In Duffield, we recited these instructions word for word:
 
 
 61
 "Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Mitsubishi,... 473 U.S. [at] 628, 105 S.Ct. 3346.... The burden, therefore, is on Duffield to demonstrate that "Congress intended to preclude a waiver of a judicial forum for [Title VII] claims" in the manner mandated by the [securities registration application]. Gilmer, 500 U.S. at 26, 111 S.Ct. 1647.... "If such an intention exists, it will be discoverable in the text of [the act at issue], its legislative history, or an `inherent conflict' between arbitration and the [act's] underlying purposes." Id. at 26, 111 S.Ct. 1647....
 
 
 62
 Duffield, 144 F.3d at 1190. We moreover closely followed these instructions in Duffield when we found that "Congress' intent to preclude the compulsory arbitration of Title VII claims is conclusively demonstrated in the text and/or legislative history of the Civil Rights Act of 1991...." Duffield, 144 F.3d at 1189-90 (emphasis added); compare with Gilmer, 500 U.S. at 26, 111 S.Ct. 1647.
 
 
 63
 Section 118 of the Civil Rights Act of 1991 provides: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including... arbitration, is encouraged to resolve disputes arising under [Title VII]." Pub. L. No. 102-166, § 118, 105 Stat 1071 (1991), reprinted in notes to 42 U.S.C. § 1981 (emphasis added). Regarding the text of § 118, we observed that especially in light of the limiting phrases "[w]here appropriate" and "to the extent authorized by law," "it would seem entirely disingenuous to fasten onto ... one word," i.e., encouraged, "and conclude that Congress was boundlessly in favor of all forms of arbitration." Duffield, 144 F.3d at 1193. Indeed, given that encouragement implies voluntariness and requirement implies involuntariness, Congress' instruction in § 118 that "arbitration ... is encouraged" if anything seems to contradict the majority's conclusion that arbitration may be required as a condition of employment under Title VII. We concluded that "the text of [§ 118] is, at a minimum, ambiguous," and we therefore turned to the legislative history of that section. Duffield, 144 F.3d at 1193. Because our detailed discussion in Duffield of § 118's legislative history unequivocally supports our holding in that case, and because the majority in the present case does not address any part of that discussion, I reproduce that discussion below at some length:
 
 
 64
 Congress in fact specifically rejected a proposal that would have allowed employers to enforce "compulsory arbitration" agreements. It did so in the most emphatic terms, explaining that:
 
 
 65
 H.R. 1 includes a provision encouraging the use of alternative means of dispute resolution to supplement, rather than supplant, the rights and remedies provided by Title VII. The Republican substitute, however, encourages the use of such mechanisms "in place of judicial resolution." Thus, under the latter proposal employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints.... American workers should not be forced to choose between their jobs and their civil rights.
 
 
 66
 H.R. Rep. No. 40(I) at 104 (emphasis added). This rejection of the "Republican" proposal provides ... "strong evidence" of Congress' intent ... to preclude compulsory arbitration of civil rights claims and to "encourage" only voluntary agreements — agreements that do not require potential employees to waive their right to litigate in a judicial forum as a mandatory condition of employment.... The [House] Committee [on Education and Labor]'s view of § 118 was reiterated by key congressmen in the floor debates, who repeatedly stated that § 118 encouraged arbitration only "where parties knowingly and voluntarily elect to use those methods." 137 Cong. Rec. S15478 (daily ed. Oct. 30, 1991) (statement of Sen. Dole); see also 137 Cong. Rec. H9548 (daily ed. Nov. 7, 1991) (statement of Rep. Hyde) (explaining that § 118 encourages arbitration where "the parties knowingly and voluntarily elect" to submit to such procedures). The most informed and important statements were made by Representative Edwards, the Chairman of the House Committee on Education and Labor. Representative Edwards unequivocally explained during the debate immediately prior to the [Civil Rights] Act [of 1991]'s passage ...: ["]This section contemplates the use of voluntary arbitration ..., not coercive attempts to force employees in advance to forego statutory rights.... ["] [137 Cong. Rec. H9530 (daily ed. Nov. 7, 1991) (statement of Rep. Edwards)] (emphasis added). Finally, President Bush echoed Congress' understanding of the arbitration section in signing the Act, stating that "section 118 encourages voluntary agreements between employers and employees to rely on alternative mechanisms such as mediation and arbitration." Statement of the President of the United States, Signing Ceremony, Pub. L. No. 102-166 (Nov. 21, 1991), reprinted in 1991 U.S.C.C.A.N. 768, 769 (emphasis added).
 
 
 67
 Duffield, 144 F.3d at 1196-97 (footnote omitted). Notwithstanding the majority's unsupported statement that the Duffield court "pick[ed] and cho[se] snippets of legislative history consistent with its desired result," maj. op. at 1001, there can be little doubt in the correctness of the conclusion by the Duffield court that arbitration agreements required by employers from their employees as a condition of employment are not "voluntary arbitration agreements between employers and employees" as envisioned by Congress for Title VII. Duffield's holding that enforcement of compulsory arbitration agreements violates the text and legislative history of § 118 of the Civil Rights Act of 1991 is compatible with Circuit City dicta that enforcement of consensual arbitration agreements does not violate the policies of federal anti-discrimination law.
 
 B.
 
 68
 Second, the majority claims that "the Supreme Court's emphatic reminder [in Circuit City] that the right to a judicial forum is not a substantive right contradicts Duffield's fundamental supposition that the Act guaranteed a nonwaivable, substantive right to a jury trial." Maj. op. at 1003. The majority attempts to support this claim by comparing the Supreme Court's statement in Circuit City that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute," 532 U.S. at 123, 121 S.Ct. 1302 (quoting Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (1991) (quoting Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346)), with our holding in Duffield that "under the Civil Rights Act of 1991, employers may not [through compulsory arbitration agreements] compel individuals to waive their Title VII right to a judicial forum," 144 F.3d at 1185. See maj. op. at 1000. Nowhere in Duffield, however, did we suggest that this "right to a judicial forum" is a substantive right, as the majority claims. Indeed, our statement in Duffield that the Civil Rights Act of 1991 "increased substantially the procedural rights and remedies available to Title VII plaintiffs," 144 F.3d at 1189 (emphasis added), suggests, to the contrary, that we perceived the right to a jury trial as a procedural right. Duffield, then, "was not premised ... on the arbitral forum causing a loss of substantive rights." Melton v. Philip Morris, Inc., No. Civ. 01-93-KI, 2001 WL 1105046, *3 (D.Or. Aug. 9, 2001). Instead, "Duffield found `the context, language and [legislative] history ... make out a conclusive case ... that Congress intended to preclude compulsory arbitration of Title VII claims.'" Id. (quoting Duffield, 144 F.3d at 1199). Accordingly, the Supreme Court's statement that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute," Circuit City, 532 U.S. at 123, 121 S.Ct. 1302 (quoting Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (1991) (quoting Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346)), does not contradict our conclusion that "Congress intended to preclude compulsory arbitration of Title VII claims," Duffield, 144 F.3d at 1199.
 
 
 69
 Most damaging to the majority's argument is that already in Duffield, we considered the very language which the Supreme Court later quoted in Circuit City — and which the majority now concludes "contradicts" our holding in Duffield — and concluded that this language was compatible with our holding there. We first wrote: "We recognize that, as the Supreme Court has stated, agreements to arbitrate must generally be treated not as `forego[ing] the substantive rights afforded by [a] statute,' but rather as merely changing the forum in which they are protected. Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 ... (quoting Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346....)" Duffield, 144 F.3d at 1199. We then explained:
 
 
 70
 Yet even assuming that the general federal policy in favor of arbitration would ordinarily apply to the compulsory arbitration of civil rights claims, we are not free to apply that policy here. Where Congress has manifested its intent, with regard to arbitration questions and otherwise, the Supreme Court has made it abundantly clear that the judiciary is not free to "legislate" its own contrary preferences.
 
 
 71
 Id. (citing Brogan v. United States, 522 U.S. 398, 406-07, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998)).
 
 
 72
 According to the majority, Circuit City contradicted Duffield by merely re-quoting language from Gilmer and Mitsubishi; language which we already considered in Duffield and found compatible with our holding there. The majority reads too much into Circuit City. Circuit City added nothing to the interpretation of the Gilmer/Mitsubishi language. In particular, Circuit City did not contradict the interpretation of that language in Duffield. In the end, the majority does no more than register its own disagreement with this court's earlier interpretation of the Gilmer/Mitsubishi language in Duffield. But as the majority acknowledges, such disagreement by one panel of this court with a prior panel of this court is not a proper ground for reconsidering the decision of the prior panel. See maj. op. at 1002 (citing United States v. Gay, 967 F.2d 322, 327 (9th Cir.1992)).[4]
 
 III.
 
 73
 Less than four years ago, the Supreme Court denied certiorari in Duffield. See Duffield v. Robertson, Stephens & Co., 525 U.S. 982, 119 S.Ct. 445, 142 L.Ed.2d 399 (1998). Last year, the same Supreme Court decided a different issue in Circuit City without as much as mentioning Duffield. In the present case, the majority, after brushing aside Duffield's careful statutory interpretation as an "exercise," maj. op. at 1000, and reading into Circuit City what isn't there, somehow reaches "the inevitable conclusion" that Duffield has been "implicitly overruled" and "no longer remains good law," maj. op. at 1003, 1008. The majority recognizes that it is error for one panel of our court to "remed[y]" the decision of another panel of our court, unless "a decision of the Supreme Court requires th[e] panel" to do so. Maj. op. at 1002.[5] Indeed, we observed in Gay that "one three-judge panel of this court cannot reconsider or overrule the decision of a prior panel," except "when `an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point.'" 967 F.2d at 327 (quoting United States v. Lancellotti, 761 F.2d 1363, 1366 (9th Cir.1985)). Because no intervening decision by the Supreme Court has undermined Duffield's holding, it is error for the majority to reconsider that holding.
 
 
 74
 Perhaps most disturbing is that the majority does not consider the consequences of its holding today. By allowing employers to require their employees, as a mandatory condition of employment, to agree to arbitrate future Title VII claims, the majority allows employers to force their employees to chose between their jobs and their right to bring future Title VII claims in court. That choice, of course, is no choice at all.[6] There may be "real benefits to the enforcement of arbitration provisions." Maj. op. at 1002 (quoting Circuit City, 532 U.S. at 122-23, 121 S.Ct. 1302).[7] That does not justify allowing employers to shove arbitration provisions down the throats of individual employees as a non-negotiable precondition of employment.
 
 
 75
 I dissent.
 
 
 
 Notes:
 
 
 [1]
 The above quoted passage fromCircuit City is dicta because it refers only to federal anti-discrimination law and Circuit City involves exclusively state anti-discrimination law. See 532 U.S. at 110, 123, 121 S.Ct. 1302. Needless to say, such dicta cannot overrule — not even explicitly and much less "implicitly" — a holding, like the one in Duffield. This fact by itself invalidates the majority's first argument in support of its conclusion that Circuit City "implicitly overruled" Duffield. But even if this were not enough, there are — as shown below — additional reasons to reject the majority's first argument.
 
 
 [2]
 InDuffield, we thus did not use the term "compulsory arbitration" as it is traditionally defined. See Black's Law Dictionary 100 (7th ed. 1999) (defining "compulsory arbitration" as "[a]rbitration required by law or forced by law on the parties"). "Compulsory arbitration," both as we used that term in Duffield and as it is traditionally defined, must furthermore be distinguished from "mandatory arbitration." See, e.g., Koveleskie v. SBC Capital Mkts., Inc., 167 F.3d 361, 362 (7th Cir.1999) (employing the term "mandatory arbitration" to reflect "the contractual situation where if one party to a dispute requests arbitration, the other party is obliged to arbitrate").
 
 
 [3]
 It is misleading to state, as the majority does, that the Supreme Court held inGilmer that "an employer could compel arbitration of an employee's ADEA claim pursuant to an arbitration provision required as a condition of his employment." Maj. op. at 999. The Supreme Court indeed stated the question presented as "whether a claim under the [ADEA] can be subjected to compulsory arbitration pursuant to an arbitration agreement in a securities registration application." Gilmer, 500 U.S. at 23, 111 S.Ct. 1647. But the Supreme Court did not use the term "compulsory" in the sense given to that term in Duffield, i.e., requiring an employee to sign an arbitration agreement as a condition of employment. See supra note 2 and accompanying text. Rather, the Supreme Court used the term "compulsory" in the sense of "mandatory," i.e., contractually required. See id. And while the arbitration provision at issue in Gilmer was indeed required as a condition of employment, this was not made an issue by the Supreme Court, which held more generally that the plaintiff "ha[d] not met his burden of showing that Congress, in enacting the ADEA, intended to preclude arbitration of claims under that Act." Gilmer, 500 U.S. at 35, 111 S.Ct. 1647. Thus, there is no conflict between Gilmer and Duffield.
 
 
 [4]
 For the same reasons, the Supreme Court's subsequent statement inEEOC v. Waffle House, Inc., 534 U.S. 279, 122 S.Ct. 754, 765 n. 10, 151 L.Ed.2d 755 (2002), that "[the Supreme Court has] held that federal statutory claims may be the subject of arbitration agreements that are enforceable pursuant to the FAA because the agreement only determines the choice of forum" does not make "Duffield's continuing validity ... questionable" or "cast doubt as to whether Congress precluded compulsory arbitration of Title VII claims," contrary to what a panel of this court recently suggested in Circuit City Stores, Inc. v. Najd, 294 F.3d 1104 (9th Cir.2002). See id. at 1107 (stating that "[u]ltimately," the Najd court did not have to "decide whether Duffield remains good law because Najd did not sue under Title VII"), see also id. at 1110 (Paez, J., concurring) (criticizing the Najd majority's "assault on the validity of Duffield" as "entirely unnecessary" and "merely gratuitous"). In support of its statement that federal statutory claims may be the subject of enforceable arbitration agreements because such agreements determine only the choice of forum, the Waffle House Court — like the Circuit City Court — merely re-quoted the same passage from Gilmer and Mitsubishi which we already considered in Duffield and found compatible with our holding there. See Waffle House, 122 S.Ct. at 765 n. 10, 122 S.Ct. 754 (quoting Gilmer, 500 U.S. at 26, 111 S.Ct. 1647 (quoting Mitsubishi, 473 U.S. at 628, 105 S.Ct. 3346)).
 
 
 [5]
 It is, therefore, irrelevant whether "[s]ince ourDuffield decision in 1998, our Sister Circuits as well as the Supreme Courts of California and Nevada have unanimously repudiated its holding." Maj. op. at 1001-02. Moreover, six of the ten cases from other circuits cited in support of this statement were decided before Duffield. In none of these six cases was the question at issue in Duffield and in the present case — whether employers may require employees, as a condition of employment, to agree to arbitrate future Title VII claims — a question that was explicitly decided contra Duffield.
 
 
 [6]
 More than three-quarters of a century ago, Andrew Furuseth, then president of the International Seaman's Union of America, said in opposition to the FAA as originally proposed: "Will such contracts be signed? Esau agreed, because he was hungry.... With the growing hunger in modern society, there will be but few that will be able to resist."Proceedings of the 26th Annual Convention of the International Seaman's Union of America 203-204 (1923). This still holds true today, if employers are allowed to require their employees, as a condition of employment, to agree to arbitrate their future Title VII claims. It was for this reason that in 1991, Congress rejected a "Republican substitute" for § 118 which would have allowed such compulsory arbitration agreements. Congress explained that "American workers should not be forced to choose between their jobs and their civil rights." H.R. Rep. No. 40(I) at 104 (emphasis added).
 
 
 [7]
 There are also well-known "potential disadvantages" from the employees' point of view, such as "waiver of a right to a jury trial, limited discovery, and limited judicial review."Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (2000) (noting also that "[v]arious studies show that arbitration is advantageous to the employers ... because it reduces the size of the award that an employee is likely to get, particularly if the employer is a `repeat player' in the arbitration system"). See also Paladino v. Avnet Computer Techs., Inc., 134 F.3d 1054, 1062 (11th Cir.1998) (noting that "[a]rbitration ordinarily brings hardship for litigants along with potential efficiency" because "[a]rbitral litigants often lack discovery, evidentiary rules, a jury, and any meaningful right to further review"); Katherine Eddy, Note, To Every Remedy a Wrong: The Confounding of Civil Liberties Through Mandatory Arbitration Clauses in Employment Contracts, 52 Hastings L.J. 771, 776-77 (2001) (noting that "[a]nother major disadvantage [of arbitration] to employee-plaintiffs is the lack of diversity among the arbitrators from which the employee may choose" because, for example, "[o]f the 50,000 arbitrators on the American Arbitration Association panels, only 6% are women").